Moncure P.
This is a writ of error to a judgment 0f t}je Circuit court of the county of Patrick, convicting Isaac C. Howell of murder in the first degree, and sentencing him to the punishment of death therefor. The prisoner moved the court to set aside the verdict and grant him a new trial because the verdict was contrary to the law and the evidence; but the court overruled the motion, and the prisoner excepted to the opinion of the court. The bill of exceptions contains a certificate of what is stated to be “ all the facts proved in the case.” The only assignment of error in the judgment is, the refusal of the court to award a new trial.
Beyond all question the prisoner killed the deceased; and-in so doing was guilty of murder. These facts were not, and upon the evidence or facts certified, could not be denied. The only question argued or raised in the case, was, whether the offence, as shown by the records, was murder in the first or second degree. The learned counsel for the prisoner argued that murder is presumed to be only murder in the second degree, unless and until it be proved to be murder in the first degree; and that the murder in this case was not proved to be murder in the first degree.
The legal proposition thus contended for is certainly true. But is it true that the murder in this case was not proved to be murder in the first degree ?
The law defining the degrees of murder may be found in the Code, chapter 187, section 1, page 1188; and is in these words: “ Murder by poison, lying in wait, imprisonment, starving, or any wilful, deliberate and premeditated killing, or in the commission of, or attempt to commit arson, rape, robbery or burglary, *997 is murder in the first degree. All other murder is muffler in the second degree.”
The offence in this case was certainly not committed. by any of the specific means enumerated in the statute, that is “by poison, lying in wait, imprisonment or starving ”; nor in the commission of, or attempt to commit, any of the specific offences therein named, to wit: “arson, rape, robbery or burglary.” Had it been so committed, it would have been murder in the first degree, whether there was any actual intent to kill or not. In other words, although the presence of an actual intention to kill would often exist in such a case, it would not necessarily constitute an ingredient of the offence, as it would be no part of its definition.
If, therefore, the offence in this case be murder in the first degree, it must be because it is embraced by the general words: “any wilful, deliberate and premeditated killing,” used in the statute. And to constitute murder in the first degree under that branch of the statute, the offence must be committed with an actual intention to kill. And to authorize a conviction of such an offence, it must appear from the evidence that such an intention existed.
Hoes it appear from the facts or evidence certified in this case, that such an intention existed ?
The certificate is in these words: That on the 21st day of November 1873, about 9 o’clock, the prisoner came to the house of Peter Via, who lived about half a mile from the prisoner’s mill, and said he “was afraid he had stretched Lee Martin,” the deceased, and he wished the witness to go with him to the mill where the deceased was. On the way to the mill, the prisoner stated to the witness, that on the same morning he, the prisoner, was in his mill, on the upper floor, stooping down upon his knees, trimming a wedge on *998 a block with a hatchet or small chop axe; that the deceased came into the mill, on the same floor on which the prisoner was, having a small sack of corn and a bucket on his arm; that the deceased placed his-sack of corn near the mill hopper (having passed by the prisoner) and turning immediately advanced upon the prisoner, while he was yet upon his knees, with an open knife in his hand, his arm drawn back in a threatening attitude—the knife being a pocket knife about six inches long, blade and handle—the blade having a sharp point; that the prisoner thereupon, in order to defend himself, struck the deceased two blows with the blade of said axe; that the deceased gave back upon receiving the first blow; advanced again with his drawn knife, and that the prisoner tapped him the second time; when the deceased, who was near the brink of the upper floor, fell to the lower floor; that the prisoner then further stated, that 'as soon as the boy fell, and he saw he was badly hurt, he went below to see what he had done; that he turned the boy over on his side in an easy position, and then went immediately to give information to the nearest neighbor, who was the witness; that the witness went on immediately to' the mill with prisoner at his request; that when they got to the mill, he found the deceased on the floor, as stated by the prisoner, and yet alive and in a very bad condition.
The prisoner went in the mill with witness to see the condition of deceased. Seeing how he was, prisoner asked him (witness) what he thought had better be done, and said he thought he would give himself up to a magistrate, if one could be found in the neighborhood. .Witness told him he knew of none near by, and that prisoner might see E. B. Turner, who was a police officer. Prisoner then requested witness to go *999 after James Wright, a school teacher near by. Witness went after Wright, saw him, delivered the message, went on to Tazewell Turner’s, and before getting to Turner’s prisoner overtook him, and said he believed he would go with him. The four parties mentioned then returned to the mill.
It was further proved that the mill house was about 22 feet square; that it was about 8 feet 8 inches from the lower to the upper floor; that there were no plank on the lower floor, and the deceased was no more than 18 inches from the brink of the upper floor when he received the blows from prisoner, and fell or struggled below; that there were two logs or sills on lower floor and that the upper floor extended over about half the upper story.
It was further proved, that the block upon which the prisoner was chopping when the deceased entered the mill, was on the right of the front door as they entered, and about four feet from the door. The distance from the door to the mill hopper is about 15 feet; from block to right hand wall about 18 inches or 2 feet; from block to mill hopper about 8 or 10 feet; that the prisoner showed one of the witnesses the place where he said the deceased stood when he was struck, and that this point was 4 or 5 feet from the block, on a line to the hopper; that the knife, the hat and the tin bucket were found below, and the hatchet above on the bag of corn with the handle next to the steps leading below, as if placed there by some one coming from below. There was blood on the blade of the axe; the hat was on the sill below, with no appearance of having been cut with the axe, with a few sprinkles of blood on it, and looking as if it was placed there—it was a felt hat and seemed to have been taken up and and put there. There were some *1000 spiinkles of blood on side of bucket; there was no blood on the upper floor. It was a cold morning and there was a little fire in the mill on lower floor. There was some blood on the side of steps in two or three places, as if made by the left hand in going up. The deceased was 15 years old, weighed about 85 pounds, was rather delicate in appearance, and was on his way to school, having come by the mill to bring his corn. The prisoner is about 45 years old, and is a strong and able bodied man. In going from the mill to Via’s house, the prisoner had to cross two branches. On his return from Via’s house to the mill, Via saw some blood on the prisoner’s hand. It was proved, that the prisoner went to the house of Wright the school teacher, and made complaint to him about the conduct of the deceased who was then attending his school, along with the prisoner’s children: this was about thi’ee days before the killing. He complained that the deceased had treated his children very badly. This was on Sunday morning. The next morning prisoner went to the school house and carried four of his children. He told the schoolmaster that the deceased had acted very badly; that he did not care about his saying anything to the deceased about it, but that he wanted him (schoolmastei’) to protect his children; that he could not and would not stand such behaviour.
It was further proved by one Daniel Martin, an uncle of the deceased, that he was at the prisoner’s mill the day before the killing, and told the prisoner he had seen his wife that day, and she, prisoner’s wife, told him, that a short time before the deceased had been at her house in the absence of her husband, and after whipping some of her children, ,the deceased abused and insulted her veiy much. Witness said he *1001 advised prisoner to tell deceased’s mother about the matter, and probably she would have him corrected. Prisoner said to witness: “I’ll get him yet.”
It was proved by vai’ious witnesses, that the prisoner had, from his boyhood, sustained a high character, as a man of truth and honesty; as a peaceable, quiet and well behaved citizen; that he had every opportunity after the killing, to make his escape, and refused to do so—surrendering himself voluntarily to the officers of the law; that after he was put in jail he could have made his escape, but refused to do so. This was proved by the jailer. There'were three wounds on the head of the deceased—one, the skin was separated from the skull, from near the top of the head to near the neck; the other two wounds were cut with a sharp instrument, about three inches long and about two . inches deep, and extending from near the upper part of the left ear toward the crown of the head. The deceased lived about twenty-four hours. There was a scratch on the left cheek of the deceased, which appeared to have been made with the finger nail.
There was some controversy in the argument, whether the certificate was intended to be of facts or of evidence only; or in part of facts, and in part of evidence only. In other words: whether the statements cei’tified as having been made by the prisoner are to be regarded as statements of fact which actually oecuri’ed in the case.
If they are to be so regarded, then it may well be •contended, not only that it is not a case of murder in the first degree, but that it is not a case of murder at all; but only a case of manslaughter, if indeed it be not a case of homicide in self-defence. Por according to those statements, while the prisoner was in his mill, *1002 stooping down upon his knees trimming a wedge on a. block with a hatchet or small chop axe, the deceased camee into the mill and advanced upon the prisoner “ with an open knife in his hand, his arm drawn back # 7 in a threatening attitude—the knife being a pocketknife about six inches long, blade and handle—the blade having a sharp point.” And “the prisoner thereupon, in order to defend himself, struck the deceased two blows, with the blade of said axe,” &c. A man may, intentionally kill his adversary in necessary self-defence. And even though it be not an act of necessary self-defence, yet the assault upon him may be in such a manner, and with such a weapon, as that, under all the circumstances of the case, his offence in killing his adversary would be only manslaughter, even though the killing was actually intended.
But these statements of the prisoner are not to be regarded as statements of fact which actually occurred' in the case. They are not certified as such; hut merely as statements made by the prisoner. And they are inconsistent with, and disproved by, the facts of the case, and cannot therefore be of facts also; for all the facts actually occurring in a case must, necessarily, be consistent.
Looking then to the facts of this case as they appear in the certificate, is it a case of murder in the first degree? Was the killing wilful, deliberate, and premeditated?
In solving this question we must look at all the circumstances of the ease. Murder in the first degree is often committed secretly, and not openly'. The homicide in this case was so committed. But the nature and grade of the offence may in such a case be often proved as plainly by the circumstances, as if it had *1003 been committed in the presence of many witnesses: , , . , , . „ . and we think such is the case here.
In the first place, a circumstance which strikes us as - , ,. . 1 , very important m this case is, the great disparity be-< tween the age and strength of the parties—the prisoner and the deceased. The prisoner was in the prime of life, about forty-five years old, and a strong and able-bodied man. The deceased was but fifteen years old, weighed about eighty-five pounds, was rather delicate in appearance, and was on his way to school, having come by the mill to bring his corn. The prisoner might, if he bad chosen, have stamped the deceased to death with his feet, or beaten him to death with fists or with hands; though his offence in that case would doubtless have been none the less. But he chose to use a more certain and speedy means of death. He used a deadly weapon—one of the most deadly of all weapons, a hatchet or small chop axe. And he used it in such a way as to ensure the death of the boy. He struck him, apparently with all his strength, three blows on the head with the blade of that axe; thus inflicting three wounds on that most vital portion of the body, two of which were about three inches long and about two inches deep, and extending from near the upper part of the left ear toward the crown of the head. Could he have expected, or intended, to inflict such blows upon that boy without killing him? Was it strange that the boy lived but twenty-four hours after receiving them? Is it not more strange that he did not immediately die under the infliction ? The law presumes that a sane man intends the natural consequence of his act. What consequence of this act of the prisoner could have been more natural than the death of the boy. It may *1004 be asked—indeed it was asked in tbe progress of the argument. If the prisoner intended to kill the deceased, why the act of killing was not completed at, ftme. an(j why wa8 ^he deceased left alive by the prisoner? The answer is, that the prisoner knew he had given the deceased a mortal wound, which must very soon cause his death, if it had not already done so, and there was no cause for doing anything more to effect the purpose in view. It does not appear that the deceased was sensible at all after he received the wounds. He may have languished insensibly until he died, but twenty-four hours thereafter. The prisoner may have believed that the deceased was actually dead when he left him. If we can suppose that the prisoner, after inflicting the wounds with a wilful, deliberate and premeditated intention to kill, changed his intention and determined not to kill, his act would have been just as' criminal, in the eye of the law, as if there had been no such change. His offence was completed when he did, with criminal intent, the act which •caused the death; however much he may, possibly, have regretted it, after it was done and before the death occurred.
The record does not show that there was anything in the conduct of the deceased at the time of the commission of the offence by the prisoner, which could have afforded the slightest excuse for the act of the latter, or reduced it from the grade of murder in the first degree. The deceased went to the mill of the prisoner on business, on his way to school, to carry a ■small sack of corn to be ground. The idea that he went there to make an assault upon the prisoner is wholly groundless. He would not have attempted so irash and mad an act, looking to the great inequality in *1005 age and strength between the two. He had no conceivable motive for such an assault, and he was wholly unprepared for it. He went without a weapon, except an ordinary pocket knife, which he no doubt accidentally had about his person. It would be absurd to suppose that he went in such a way to assault such a man in his own house, when there was no one near to prevent his being killed by his adversary, which might so easily have been done.
But while the deceased had no motive for such an assault, and would have been so rash and mad in making it, such was not the case in regard to the prisoner. He had a motive, real or imaginary. The deceased went to school with the prisoner’s children, and had as the prisoner said, and as his wife said, treated them badly. It does not appear what was the nature and extent of this bad treatment, except that the wife said to an uncle of the deceased that the latter had, a short time before, been at her house in the absence of her husband, and after whipping some of her children abused and insulted her very much. The deceased may have acted very badly in regard to the children of the prisoner, and may have deserved reasonable chastisement for his conduct in that respect. Whether he did or not, and to what extent, we cannot know from the record in this case. Nor is it material that we should know. Had the prisoner been content, as he should have been, to have had the deceased reasonably chastised for-his conduct, nothing would have been easier than to have had it done. He might have had it done no doubt both through the teacher and through the mother of the boy. But it appears that the prisoner had in his mind a different kind and degree of punishment of the deceased from that chas *1006 tisement which is inflicted on children with a view to their correction—a punishment no less than that of death-the highest punishment known to the law for the highest crime. That the purpose of the prisoner was revenge, and not reasonable chastisement, is shown by what he said both to the teacher and to the uncle of the deceased. He told the teacher, about three days before the killing, that the deceased had treated his children very badly ; “ that he did not care about his saying anything to the deceased about it, but that he wanted him (the schoolmaster) to protect his children; that he could not and would not stand such behaviour.” And when advised by the uncle of the deceased to tell his mother about the matter, who would probably have him corrected, prisoner said to the uncle: “ 111 get him yet.” He got him the day after.
How the close connection between these threats and the act which they foreshadowed, and the circumstances attending its commission, show that “it was an act of wilful, deliberate and premeditated killing, and of course murder in the first degree.” The deceased could not have expected an attack from the prisoner, or he would not have placed himself so completely in his power. It does not appear from the facts certified in the record that the deceased made any resistance. He had not time, even if he had had strength, and the means at hand to make, it. The first blow of the axe no doubt staggered and stunned him, and wholly disabled him from making any resistance. There was not a mark or scratch on the person of the prisoner after the affair was over; nor a drop of blood, except some on his left hand, which was the blood of the deceased.
In regard to the good character of the prisoner, and *1007 his conduct after the killing in not making his escape, but giving himself up to be tried for the offence, these are not sufficient to repel the effect of the strong, if not conclusive proof of his guilt afforded by the facts certified in the record. His conduct afterwards may liave been, and doubtless was, induced by a desire to make out thereby a case of self-defence; or, at all ■events, to extenuate the degree of the crime of which he might be convicted, and to mitigate his punishment.
JBut even if we had any doubt as to the degree of the offence in this case, it is certainly not sufficient to warrant us in reversing the judgment of the court for •any supposed error in that respect. It was the province of the jury in finding the prisoner guilty, to find whether he was guilty of murder in the first or second degree. The jury which found the prisoner guilty in this case found him guilty of murder in the first degree. The court in which he was tried, which heard and saw the witnesses testify, was moved to set aside the verdict and grant a new trial, because the verdict was contrary to law and the evidence; but overruled the motion, and pronounced the judgment. According to well settled law and practice, this court would not be warranted in reversing the judgment. It is therefore affirmed.
We have referred to no authorities in the foregoing opinion considering the principles of law therein stated to be well settled. Reference may be had, however, if desired, to the following, besides other cases on the subject. King’s case, note thereto 2 Va. Ca. 84; Wick’s case, Id. 887; Burgess’s case, Id. 483; Whiteford’s case, 6 Rand. 721; Jones’s case, 1 Leigh 598 ; Bennett’s case, 8 Id. 745; McCune’s case, 2 Rob. 772; Hunter Hill’s case, 2 Gratt. 595; Read’s case, 22 Id. 924.
*1008 Christian, Anderson and Boudin, Js. concurred in the opinion of Moncure, P.
Staples, J. without dissenting from any part of the opinion of Moncure, P. concurred in affirming the judgment, on the ground that it is not a case in which this court can reverse the judgment of the court below.
Judgment arrirmed.