Anderson, J.,
delivered the opinion of the court.
The court is of opinion that the homicide committed by the prisoner, as shown by the evidence in the record, is murder. And the only question is one of degree—whether *932 mur<^er 'n first or second degree. All murders are presumed in law to be murder in the second degree; and order to elevate the offence to murder in the first deoree, the burden of proof is on the commonwealth. And ® to reduce the offence to manslaughter, the burden of proof is on the prisoner. That the offence proved is greater than manslaughter, the prisoner’s counsel does not deny; but contends that it is not murder in the first degree, but only .murder in the second degree.
The evidence shows that on the 14th of February, 1878, '.¿bout one o’clock afternoon, the prisoner was on his way to Leech’s shop, in Lee county, and said to Hilda Olinger, a witness, that he was going thereto get a dram. He had been drinking then so much that witness told him she thought he had enough. At Leech’s shop he met the deceased and T. S. Coldiron, another witness, who testifies that both the prisoner and deceased were drinking, and were tolerably drunk; deceased had a bottle of liquor. ‘They, together with Coldiron, went from the shop to Dr. JEdmonds’ store, where they still had the bottle and continued to drink. After remaining there a while, all three .left together on their way home, and stopped at John Drown’s for supper. While they were there the difficulty •occurred which resulted in the death of the deceased a few -days after from paralysis, caused by a blow which he received from the prisoner on his head with an axe.
The only provocation which the prisoner received from the deceased was given in conversation whilst they were sitting together at the supper table. They had spent the .greater part of the day jovially together, and on terms of familiarity and friendship, and it was upon the invitation ■ -of the prisoner that the deceased stopped with him on their way home at the house of John Brown for supper. Prisoner ordered the supper, and when it was prepared he sat flown and invited deceased to sit with him at the table. Whilst they were partaking of the food which had been *933 prepared for them, Mr. Coldiron engaged in conversation with Mrs. Brown, and the prisoner and deceased engaged in conversation together, which seems to have been com-menced by the prisoner, in a friendly way, by reminding deceased that he had not come to eat supper with him on the occasion of his son James’ infair. The deceased seems to have explained the reason why he was not there in a friendly way, but then said something about the acts of prisoner to his other children—that he had made distinctions between them. The witness does not say what acts he referred to, or whether he specified anything. But his remarks, whatever they were, appear to have been, if not a reproach, an expression of the deceased’s disapproval of the prisoner’s treatment of his other children; to which, however, the prisoner does not seem to have taken serious umbrage at the time, as he replied, that “he would do as much for his son Henry.” But the deceased then said something about prisoner’s wife, who was then an inmate of the lunatic asylum. What the remark was is not disclosed by the testimony. But the prisoner became at once, greatly excited, and said when his wife’s or children’s names were mentioned he felt like cutting his throat,, pushed back his plate, and took the knife with which he was eating and drew or jerked it across his throat and quit.' eating. The witness Brown does not remember what the remark was, and Coldiron being engaged in conversation,, did not understand what it was. But neither the deceased nor other persons at the table seemed to have attached any importance to it, or to have been disturbed by it; for they finished their dinner, and then seated themselves around the fire, the deceased playing with a little girl, and tarried awhile after prisoner and Coldiron had passed out and invited Mr. Brown and his family to visit him and his family. But the prisoner, very much excited, left the table and went out, and in a short time returned, showing, great excitement and violent passion, demanding to know *934 0f deceased what he was saying about him : wdien deceased J 0 . replied he had said nothing about him, responding that he was a God damned liar.” All present said deceased pad said nothing about him. He repeated, “It is a ° a / damned lie”; and said to Coldiron, “Let’s go.” The prisoner’s deportment was that of a drunken man, whose epithets of abuse and vituperation are not thought worthy of notice, and seemed to have been so regarded by the deceased, who did not resent them or further notice them. Prisoner left and Coldiron followed, and deceased, soon after he came out after Coldiron, received the fatal blow. Prom all that appears by the evidence he had no adequate motive or provocation for the horrible deed he perpetrated.
But whatever motive or provocation he had, it was sudden and unexpected. All the witnesses who testify as to the character of the prisoner, represent him to be a very quiet and peaceable man when sober, but when in liquor he was wild and excitable, rough and anxious to destroy. But for the free indulgence in the intoxicating draught that day, it is evident that this terrible misfortune would not have befallen these men—this dreadful crime would not have been committed—both of them might be alive this day, and free from restraint, discharging towards each other the offices and courtesies of neighbors and friends. It was whiskey which brought upon them this sudden, irremediable ruin.
But voluntary intoxication is no excuse for the commission of crime. Lord Hale says “ the third sort of madness is dementia affectata—namely, drunkénness. This vice •doth deprive a man of his reason, and puts many men into a perfect but temporary frenzy; but by the laws of England such a person shall have no privileges by his voluntary contracted madness, but shall have the same judgment as if he were in his right senses.” And so Parke, B., •says, if a man makes himself voluntarily drunk, it is no •excuse for any crime he may commit whilst he is so; he *935 takes tlie consequences of his own voluntary act, or most crimes would go unpunished.” Cited by 1 Wharton on Criminal Law, §39. And this writer says, In with this is the whole current of English authority. And . . that “in this country the same position has been taken with marked uniformity; it being invariably held that voluntary drunkenness is no defence to the factum guilt.” Id. § 40.
But while intoxication per se is no defence to the fact of guilt, yet when the question of intent or premeditation is concerned, evidence of it is admissible for the purpose of determining the precise degree. Id. § 41. In all cases where the question is between murder in the first degree and murder in the second degree, the fact of drunkenness may be proved, to shed light on the mental status of the offender, and thereby to enable the jury to determine whether the killing sprung from a premeditated purpose, or from passion, excited by inadequate provocation.
By our statute, murder by poison and lying in wait, imprisonment, starving, or any wilful, deliberate and premeditated hilling, or in the commission of, or attempt to commit arson, rape, robbery, or burglary, is murder of the first degree. All other murder is murder of the second degree. (Code of 1873, p. 1188, c. 187, § 1). To convict of murder in the first degree by wilful, malicious, deliberate and premeditated killing, the jury must ascertain as a matter of fact, that such was the state of mind of the accused when the act was done. Any state of drunkenness being proved, said the court in Haile v. State, 11 Hump. 154, is a legitimate subject of enquiry as to what influence such intoxication might have had upon the mind of the offender in the perpetration of the deed. We know that an intoxicated man will often, upon a slight provocation, have his passions excited, and rashly perpetrate a criminal act. It is unphilosophical to assume that he should be chargeable with the same degree of premedita *936 tion and deliberation that would be ascribed to a sober . man perpetrating the same act upon a like provocation. the rule has been laid down by the courts, that in ail eases where the question is between murder in the first- and murder in the second degree, the fact of drunkenness may be proved to shed light upon the mental status of the offender, and thereby to enable the jury to determine whe-. ther the killing sprung from a premeditated purpose, or from passion excited by inadequate provocation. 1 Whart. Cr. Law, in note to § 41. Great caution is necessary in the . application of this doctrine, for there are few cases of pre- . meditated violent homicide in which the defendant does not previously nerve himself to the encounter by liquor. When that is so, drunkenness is entitled to no consideration in favor of the offender in determining whether the offence is murder in the first or second degree. On the contrary, it tends strongly to elevate the crime to murder in the first degree. Voluntary immediate drunkenness is not admissible to disprove malice, or to reduce the of-fence to manslaughter. But where, by reason of it, there is wanting that deliberation and premeditation which are-necessary to elevate the offence to murder in the first degree, it is properly ranked as murder in the second degree; as the courts have repeatedly decided. Com. v. Jones, 1 Leigh, 598; Pirtle v. State, 9 Humph. 663; Swan v. State,. 4 Humph. 136; Boswell v. Commonwealth, 20 Gratt. 860.
In Pirtle v. The State, supra, Judge Turley, in delivering the opinion of the court, said, where the question is whether the killing was the result of sudden passion, produced by a cause inadequate to mitigate it to manslaughter,, but still sufficient to mitigate it to murder in the second degree, or whether it has been the result of premeditation and deliberation, whatever is able to cast light upon the mental status of the offender is legitimate proof, and among others the fact that he was at the time drunk; not that this will excuse and mitigate the offence, if it were *937 done wilfully, deliberately, maliciously and premeditately, (which it might well be, though the perpetrator was drunk at the time), but to show that the killing did not from a premeditated purpose, but sudden passion, excited by inadequate provocation, such as might reasonably be expected to arouse sudden passion and heat to the point of taking life, without premeditation and deliberation. Here the court explicitly lays down the rule to be, that in all cases where the question is between murder in the first and murder in the second degree, the fact of drunkenness may be proved to shed light upon the mental status of the offender, and thereby to enable the jury to determine whether the killing sprung from a [premeditated purpose or from passion, excited by inadequate provocation. Cited by L Wharton Cr. Law, in note to §41. The court, we think,, very properly held that drunkenness will not mitigate theoffence, if it were done wilfully, deliberately, maliciously and premeditatedly. It is only entitled to weight when and so far as it tends to show that the offender did not act and was not in a frame of mind to act with that deliberation and premeditation which is necessary to constitute murder in the first degree.
From the evidence in this case, the prisoner was greatly under the influence of liquor when he inflicted the death wound upon the deceased. About one o’clock that day he told one of the witnesses—Dilder Olinger—that he was going to Leech’s shop to get a dram. This was before he met with deceased. He had then been drinking; and witness thought he had enough, and told him so. He met with deceased at Leech’s shop; and T. S. Coldiron testifies that both prisoner and deceased were pretty drunk; deceased had a bottle of whiskey, and they drank together at the shop—how often does not appear; the probability is several times. They came on together to Dr. Edmonds’ store, and were still drinking there, and still had the bottle. And Brown testifies that after they got to his *938 ^ouse’ where they stopped for supper, they were all drinking some. There is not the slightest evidence that the through all the jovial hours he spent this day with. the deceased, meditated an assault upon him to take . 1 his life, or that he drank to nerve himself to the encounter. The evidence absolutely repels such an idea, and shows that he commenced drinking before he saw the deceased, and when, most probably, he had no thought of seeing him that day. And when he met him at the shop, where he went to get another dram, he drank with him, and they continued together and drank together the balance of the day, on terms of familiarity and friendship, until prisoner suddenly took umbrage at some remark which deceased made at the table, became greatly excited, left the table without finishing his dinner, went out of doors, and in a short time returned, exhibiting the most violent passion. Excited and inflamed by the fumes of liquor in his brain, he gave him the blow with an axe, which resulted in his "death. There can be no doubt, we think, that the giving the fatal blow by the prisoner was the result of sudden ;'passion, engendered and influenced by the liquor which he had been pouring into him during the day, and which caused him to take offence where none was intended, and which disqualified him for deliberation, and repels the idea that the deed was premeditated, there being nothing in the case to create even a suspicion that he imbibed the intoxicating draught to nerve him to the commission of a crime Which he bad premeditated.
Whilst we hold that intoxication is no excuse for crime, •and whilst murder in the first degree may undoubtedly be committed by one who is intoxicated at the time, yet a murder committed, as in this case, by a drunken man, from ’sudden passion, which imagines a provocation when there was none, or any adequate provocation, and by reason of intoxication the offender was not in a frame of mind to 'deliberate and premeditate, the crime, we think, under the *939 •statute, could not be elevated to the crime of murder in the first degree, which requires that it shall be wilful, deliberate and premeditated. But as intoxication is no excuse for crime, and cannot be relied on to disprove malice, we are of opinion that the prisoner in the case at bar was .guilty of murder in the second degree.
We attach no importance to the declarations which the prisoner is proved to have made, ten or twelve years before, when he was drunk, expressive of hostility to the deceased and threatening to kill him; or of the more recent threat, which was nine months prior to the commission of the offence for which he is now prosecuted—such threat •also having been made when he was very drunk—and the ■evidence showing that they were very-friendly, and there being no evidence that their relations were at all unfriendly when the last threat was made in a fit of drunkenness. We say we can attach no importance to the testimony of that •character, especially when the evidence in this case clearly ■shows that the prisoner, in inflicting the fatal blow, was •actuated alone by a supposed recent provocation, though it was inadequate, but which he, under the influence of liquor, magnified into a most grievous and aggravated provocation ; and which, if he had been sober, would not have regarded as a provocation at all, and it would not have given him offence.
It is often difficult to apply the principles which distinguish between murder in the first and second degree. We ■do not think that the instructions given by the court to the jury are erroneous. We think the jury either misunderstood them, or misapplied the law to the facts, as it was laid down by the court. We are clearly of opinion, upon ■the law and the facts, that the offence proved is murder ; and as all murders are presumed in law to be murder in the second degree, and to elevate the crime to murder in ■the first degree, the burden rests upon the commonwealth; -and we think.she .has Jailed to show that it is murder in *940 ®r,s^ degree, we are °f opinion that it must be ranked as murder in the second degree. We are of opinion, there-that the verdict of the jury of murder in the first dep-ree is not warranted bv the law and the facts of the case., u *, ' and that the circuit court erred in overruling the motion, to set aside the verdict and to grant the prisoner a new trial.
"We are of opinion, therefore, to reverse the judgment of the circuit court, to set aside the verdict, and to remand the cause for a new trial, to be had therein, in conformity with the principles herein declared.
The judgment was as follows:
The court being of opinion, for reasons stated in writing and filed with the record, that whilst the evidence certified proved the prisoner guilty of murder in the second degree,, it did not warrant the finding of the jury of murder in the first degree, and that the court erred in overruling prisoner’s motion to set aside the verdict and to grant him a new trial. It is therefore considered that the judgment of the circuit court be reversed and annulled, that the verdict be set aside, and the cause remanded to said circuit court for a new trial, to be had therein, in conformity with the principles declared in the opinion, filed, with, the-record..
Judgment reversed..