# WHEELING.

## State *v.* Welch.

Submitted June 15, 1892.—Decided June 18, 1892.

1. JURY.

The list of persons for jury service and the ballots of the names thereon prepared by the jury commissioners annually, at the levy term of the County Court, pursuant to chapter 116, Code 1891, take the place of and supplant lists and ballots made prior thereto, and ballots belonging to a former list are not to mingle in the box used for keeping jury ballots, from which jurors are drawn, with ballots belonging to the later list. Hence, a jury made up of jurors as drawn from such box, containing exclusively ballots belonging to the last annual list, is proper and valid. This does not refer to a list made subsequently to the making of such annual list in any year under order of court. (p. 691.)

2. EVIDENCE—BLOOD STAINS.

A witness may give his opinion that stains seen by him are blood stains, and that a certain large stain seen by him upon bedclothing was the stain of a pool of blood. (p. 693.)

3. EVIDENCE.

A witness may give his opinion that a depression in a bed was, from its shape and appearance, caused by the head of a person, he having seen and examined it. (p. 691.)

4. EVIDENCE.

Opinion evidence discussed. (p. 691.)

5. EVIDENCE.

A statement made by a person accused of crime upon the occasion of the preliminary examination before a justice, when he was not sworn or examined as a witness, is not inadmissible by reason of section 20, c. 152, Code 1891. (p 697.)

6. MURDER.

A man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act; and if the prisoner, with a deadly weapon in his possession, without any, or upon very slight provocation, gives to another a mortal wound, the prisoner is *prima facie* guilty of willful, deliberate, and premeditated killing; and the necessity rests upon him of showing extenuating circumstances; and unless he proves such extenuating circumstances, or they appear from the case made by the State, he is guilty of murder in the first degree. (p. 701.)

7. MURDER—NEW TRIAL—DEGREE IS FOR JURY.

The question whether a particular homicide is murder in the first or second degree is one of fact for the jury. Where a jury has found the case to be one of murder in the first degree, as in other cases, the court should not disturb the verdict, unless the finding of murder in the first degree be plainly and manifestly contrary to or without sufficient evidence. (p. 703.)

*P. J. Crogan* for plaintiff in error cited 9 W. Va. 456; 14 W. Va. 851; 12 W. Va. 23; Code (1891) c. 116, s. 16; Stark. Ev. 96, 153, 157; 1 Greenl. Ev. 440, 530; Ros. Cr. Ev. 179; 23 W. Va. 288; Code (1891) c. 152, s. 20; 31 W. Va. 505; 28 W. Va. 297; 20 W. Va. 679; 2 Gratt. 594; 1 Leigh 669; 2 Humph. 439; 26 Gratt. 997; 8 W. Va. 320; Id. 744; 5 Mich. 1; 64 Mo. 191; 58 Mo. 408; Wright (Ohio) 20; 75 Pa. 424; 30 Tex. 466; 36 Tex. 523; 41 Tex. 86; 32 Gratt. 929; 21 W. Va. 709; 26 W. Va. 117; 6 Gratt. 712; 12 Gratt. 717; 26 W. Va. 116.

Attorney-General *Alfred Caldwell* for the State cited Whar. Ev. § 512; Step. Ev. 103; 39 Ind. 235; 14 Kan. 105; 114 Mass. 295; 73 N. Y. 586; 76 Mo. 501; 23 Ala. 28; 62 Ala. 237; 46 N. H. 23; 78 Ind. 15; 55 Wis. 249; 18 Vt. 626; 19 Ohio 302; 60 Ia. 429; 7 Am. & Eng. Ency. L. 492, 496, 502; 14 Gratt. 613; 22 Gratt. 924; 25 Gratt. 905; Code (1891) c. 152, s. 20; 28 W. Va. 297; 6 Rand. 721; 1 Leigh 598; 8 Leigh 745; 20 W. Va. 681; Id. 713; 20 Gratt. 860; May. Guide 349.

BRANNON, JUDGE:

In September, 1891, James Welch was convicted, in Preston county, of murder in the first degree for the murder of Celia Welch, his wife, and was sentenced to the penitentiary for life, and he has brought the case to this Court by writ of error.

The prisoner's counsel asks us to consider whether there is error in the proceedings of the Circuit Court in the following particulars: Was the jury lawful? The jury commissioners of Preston county, by order of the Circuit Court, in June, 1891, made a list of persons to serve as jurors, and also ballots of their names, which ballots were deposited in a box. See sections 3, 5, c. 116, Code 1891. Afterwards,

in July, 1891, at the levy term of the County Court, the jury commissioners made another list of persons to serve as jurors, and corresponding ballots with the names of such persons thereon, and they took from the box the ballots remaining from the June list, and placed in said box in their stead the ballots containing the names of the persons on the July list, and deposited the ballots of the former or June list in another box. In September the jurors for the trial of the prisoner were of those on the list and ballots made in July.

It is contended that the commissioners had no right to withdraw from the box containing jury ballots the ballots belonging to the June list; that the only way of exhausting ballots is by destroying them, under section 11, or by their being drawn to serve, under section 12; that in effect, the June ballots should have been left in the box and mingled with ballots of the July list, so that the jury should have come from both by the chance of drawing ballots from the box.

The court thinks there is no error under this head. The statute, in section 3, provides that "the jury commissioners of each county shall, at the levy term of the County Court thereof, annually, and at any other time when required by the Circuit Court," prepare the list of jurors, and, in section 4, provides that they shall, at the time such list is made out, place all its names on paper ballots and deposit these in a box, and in other sections provides for drawing ballots from such box for jurors to serve at each term of the Circuit Court. The statute contemplates a new list to be made each year, at the levy term of the County Court, and when made, by operation of law, that list, and the ballots of the names thereon, take the place of and destroy the former list and its ballots.

It is true ballots can not be exhausted except by destruction, as provided in section 11, or by drawing, as provided in section 12, but that is while they are in force. But when they are no longer in force, but supplanted by the new annual list and its ballots, they should be taken from the box. The statute does not expressly say that the old ballots shall be taken from the ballot box, but by requiring each

year a new list and ballots under it, and by providing for custody by the clerk of the list so prepared, and for making ballots of names on "such list," and placing them in a box and drawing jurors therefrom, it evidently means one list— the annual list—and excludes the idea that the law-makers intend to carry over from year to year the old list and its unexhausted ballots. If such was the design, we should ask plain language to express it. The word "annually," in section 3, has decisive force upon this matter. If the old ballots are to be carried forward from year to year, jurors on one list might be put on another, as there is no prohibition, and the same jurors would be on different ballots. Under this construction there might be a great accumulation of ballots in a number of years.

Did the court err in allowing witness Gibson to state that in his opinion, from the appearance of the depression in the bed, and from the character of the blood-stain, there had been a pool of blood in the bed? The theory of the State was that the deceased was killed by beating her on the head with a large piece of fire brick, inflicting numerous cuts and wounds, while she was lying on the bed, and that a depression was made by her head in the bed, and that in this depression was a quantity of her blood. The witness described this depression and a clot of gore in it, and was asked whether from the appearance of the depression in the bed, and the character of the stain as he saw it, in his opinion there had been a pool of blood there, and answered, "Yes."

It is the constant practice upon trials for murder to admit evidence of the presence of blood spots upon clothing of the prisoner or the deceased, or at the scene of the tragedy. Any witness, expert or non-expert, may testify that the stains resembled blood. 7 Amer. & Eng. Enc. Law, 502; *Baker's Case*, 33 W. Va. 319 (10 S. E. Rep. 639); Whart. Crim. Ev. § 777; *Greenfield* v. *People*, 85 N. Y. 75; *McLain* v. *Com.*, 99 Pa. St. 86; *Dillard* v. *State*, 58 Miss. 368; *People* v. *Gonzalez*, 35 N. Y. 49.

But the point of the objection is that the witness gave it as his opinion that it was blood? Opinion, though not generally admissible, is very frequently so. While the di-

viding line between what is fact and what is opinion can not be very clearly defined, a witness, though not an expert, may testify to his conclusion from facts observed, when the matter to which the testimony relates can not be reproduced or described to the jury precisely as it appeared to the witness at the time. In such cases opinions are received in furtherance of justice. *Yawn* v. *City of Ottumwa*, 60 Ia. 429 (15 N. W. Rep. 257); Steph. Ev. 103; Whart. Ev. § 512. It is not practicable to bring into courts walls, floors, or ground stained with blood; not always practicable to produce beds or furniture. And the appearance after a lapse of time is not as it was when fresh after the tragedy to the witness.

In *Greenfield* v. *People*, 85 N. Y. 75, a witness was told that he was not expected to give his opinion, but, if he could, to state as a fact what certain spots were, and he stated they were blood. The admission of the evidence was held no error. It is difficult to see, as commonly understood, what was the difference between a witness's saying from mere inspection that a spot was blood and saying that in his opinion it was blood. It was treated as a statement of fact. We say a certain object is a certain thing; that a spot is an oil spot, a paint spot, or ink spot. Is the statement one of fact or opinion under the principles of evidence? Such evidence is admissible. Why not also a statement that a spot is a blood spot, or that it resembled blood, or that, in the opinion of the witness, it is blood?

A witness who had seen the depression above mentioned gave his opinion that it was made by a person's head. What has been said above will sustain this evidence. It was relevant to show that this depression existed. How could it be conveyed to the jury except by the opinion of a witness? He could not exactly describe it so as to present it to the jury as he saw it. The depression would be destroyed by conveying the bed to court.

It is assigned as error that Dr. Pasten was allowed to answer, "No," to the following question: "From the character of the wounds that you observed, having noted the fact that there was coagulated blood, indicating that the person was warm when the blows were struck, could it have

been possible for her to have stood up, or have been held in an upright position, without blood having flowed down under her garments, on her person ?"

The dead woman was dressed in a calico skirt and a short thin jacket, but no dress on, and had stockings on, but no shoes. The face and neck were cut and bruised till she was scarcely recognizable ; the nose broken ; a part of one ear mangled off; the head and face covered with blood ; there were fourteen cuts and bruises on the face, and on the left side and back of her head the scalp was cut and mashed in small pieces, as if done by a blunt instrument by blows often repeated, the scalp all separated from the skull from the neck to the top of the head ; two teeth knocked out, and the hair was in places torn from the scalp and matted in the blood on her face. Blood was on the floor of the one bed room, and leading to the adjoining front room, where the dead body was lying, and blood in the front room, and about the front door. A piece of fire brick, the larger half, was on the bed covered with blood and hair. Thus there was a copious flow of blood from the head.

The State sought to show that she was, while on the bed, beaten to death with a piece of fire brick, and was then dragged into the front room, and could not have been standing up in an altercation, as no blood appeared below the neck. This witness was a physician who examined the wounds, and was competent from his profession to judge from their character whether the escape of blood would be large or small in quantity, so as likely to be apparent on the person of the deceased below the neck. I am not prepared to say that one not a physician would not be competent to express this opinion. The wounds, the blood over the head and on the bed, the floors and wherever it appeared would better enable one present and seeing the whole to form an opinion as to the probability of blood appearing below the neck of the deceased than a jury could form from a verbal description of the appearances at the scene of the murder, because of the inability of witnesses by mere words to present fully and accurately that appearance. It is an opinion on imperfectly explainable facts—on classes of facts

which, while they may be observed with sufficient accuracy and fullness to be described, and constitute a just foundation for an opinion, can only be imperfectly narrated. In reason, the inference which a witness draws from a series of observed facts must be helpful to a jury.

The decisions on this class of questions are uncertain and conflicting, but the result is that the witness is to relate the facts as fully and exactly as he can, and add his conclusion from all he saw and heard, as the only practicable method of supplying the necessary imperfection of narration. Bish. Crim. Proc. § 1177 ; *Taylor* v. *Railroad Co.*, 33 W. Va. 54 (10 S. E. Rep. 29).

But if this evidence were not proper, I do not think we should for that reason reverse the judgment. The tendency of the evidence was to show that the deceased was beaten on the head while lying down, not while standing, and thus negative any idea in favor of the accused that there was an altercation and consequent heat of blood, and thus elevate the degree of the homicide. Now, upon the evidence touching the many and ghastly wounds upon the head of deceased—all over it, sinking to the bone, from chin to ear, cutting off part of an ear, mangling the scalp so that the parts could not be gathered together, tearing off part of it, and the impression of the head on the bed, and the blood in it—it would seem that there was ample evidence, without this opinion, to justify the conclusion that had these blows been received while the deceased was standing, blood would have appeared below the neck. It is clear that the jury would have so found without it. And on the whole evidence of the case, we feel sure that, without this opinion, the verdict would have been the same; that its rejection would not have produced a different result.

It is settled that while the admission of improper evidence, if objected to, will be presumed to prejudice the defendant, and if it may have prejudiced him, though it be doubtful whether it did or not, it will be ground for reversal; yet if it clearly appear that it could not have changed the result—that if it had been excluded the same result would have followed—it will not be cause for re-

versal. *Taylor* v. *Railroad Co.*, 33 W. Va. 39, 57 (10 S. E. Rep. 29) ; *Hall* v. *Lyons*, 29 W. Va. 410 (1 S. E. Rep. 582).

It is assigned as error that the court allowed the State to give in evidence certain statements of the prisoner made upon the occasion of the preliminary examinatian before the justice, because of section 20, c. 152, Code 1891, providing that "in a criminal prosecution, other than perjury, evidence shall not be given against the accused of any statement made by him as a witness upon a legal examination." *Hall's Case*, 31 W. Va. 505 (7 S. E. Rep. 422) is cited to support this objection to the judgment, and it holds that "no statement made by one accused of crime, while a witness testifying in his own behalf before a justice on his preliminary examination, can be used against him on his trial." The statute and Hall's Case do not apply, because here Welch was not a witness. After the evidence on the examination had closed, the justice asked him if he wished to make any statement, and he made the statement given in evidence. And moreover, he stated on the trial before the jury, as a witness in his own behalf, and at other times, substantially the same facts as in this statement.

Did the court err in giving three certain instructions asked by the State ? "First Instruction. To convict one of murder it is not necessary that malice should exist in the heart of the accused against the deceased. If the accused was guilty of striking, with a deadly weapon, another, and of killing him, the intent, the malice and wilfulness deliberation and premeditation, may be inferred from the act ; and such malice may not be directed against any particular person, but such as shows a heart regardless of social duty and fatally bent on mischief."

This instruction, I think, constitutes the main ground of reliance of prisoner's counsel for the reversal of the prisoner's sentence. The brief of counsel presents the point as forcibly for the prisoner as it can be put, as follows :

"The first sentence of this instruction propounds the law correctly ; the latter part of it, after the word 'act,' also lays down the law ; but that portion which says, 'If the accused was guilty of striking, with a deadly weapon, another, and of killing him, the intent, the malice and willfulness, de-

liberation and premeditation, may be inferred from the act,' is not the law. This instruction was taken from the first syllabus of the *Douglass Case*, 28 W. Va. 297, but inserts the word 'willfulness, deliberation, and premeditation.' In the Douglass Case there was a verdict of murder in the second degree, and the syllabus referred to makes out a case of murder in that degree. The instruction given in the case at bar, if it means anything, makes out a case of murder in the first degree. It does not presume that the homicide is murder in the second degree, and instruct that, if the State would elevate it to murder in the first degree, she must establish the characteristics of that crime, as laid down in the Case of Douglass, and in *Cain's Case*, 20 W. Va. 679; but it lays down the proposition that the willfulness, deliberation, and premeditation (the characteristics of the crime of murder in the first degree) may be inferred from the act (the act of striking, with a deadly weapon, another, and of killing him). Striking with a deadly weapon and killing is presumed to be murder in the second degree. Consequently, the intent and the malice may be presumed. And hence from the mere act there can be no inference of willfulness, deliberation, and premeditation, but it must, to raise such a presumption, be shown that there was no, or but very slight, provocation, and the instruction should so state; otherwise it is confusing and misleading. *State* v. *Cain*, 20 W. Va. 679, syllabi 9, 11, 13."

This contention of the prisoner's counsel, though well put, can not be sustained. He is correct in the position that where we find that one person has killed another, without further showing beyond the simple fact of killing, it is *prima facie* attended with malice, entering into murder as one of its ingredients, and is murder in the second degree. If the prosecution desires to raise the act to the first degree, it must show that the killing has the circumstances or features of murder in the first degree; that is, that the act was willful, deliberate, and premeditated; and if the prisoner would reduce it below murder in the second degree, the burden of proof of facts, lowering it, rests on him. *Hill's Case*, 2 Gratt. 595; *Cain's Case*, 20 W. Va. 681.

But shall a jury in ascertaining the degree ignore the

character, circumstances, and nature of the act—the entire transaction? Surely not. They are the very things giving caste and quality to the act. Here is a woman found dead. Upon her face, sides, and back of the head are dreadful wounds of deadly character, fourteen in number, lacerating the flesh of face and scalp to the bone, coming, not from only one blow but blows repeated again and again, with the larger part of a heavy, coarse-grained fire brick—a deadly weapon when blows with it are delivered upon the skull—and delivered by a man upon a woman, and while she is held down by him, or the fury of the blows, upon a bed, thus negativing all appearance or place for provocation. Are these features to be forgotten by a jury? Though no human eye saw the monstrous deed of such a murder by a husband of a wife, what could more forcibly tell a jury of the character and quality of the act or the degree of its criminality? Shall the State under the legal rule be required to present other evidence to sustain, in an appellate court, or in a circuit court, the finding of a jury that it was murder in the first degree? As the opinion in *Howell's Case*, 26 Gratt. 1002, says: "Murder in the first degree is often committed secretly, not openly. The homicide in this case was so committed." (So in our case.) "But the nature and grade of the offence may in such case be often proved as plainly by the circumstances as if it had been committed in the presence of many witnesses."

But I forget not that the question is upon the instruction. Did it err in telling the jury that from striking and killing with a deadly weapon, the intent, malice, willfulness, deliberation and premeditation may be inferred? If it had added "without any or upon slight provocation," it would surely be in the line of well-considered cases; but the omission of this is said to be its fault.

First, I observe that this instruction does not tell the jury that, as a matter of law, the law presumes from the use of a deadly weapon that the act was willful, deliberate, and premeditated, but only that the jury may infer or find from its use that such was the character of the act, leaving it entirely to the jury to say whether under all the circumstances the use of such weapon was evidence of such character of

act. The question whether the act was murder in the first or second degree was one of fact for the jury exclusively. *Howell's Case,* 26 Gratt. 1007.

The use of a deadly weapon may certainly be taken into consideration by the jury in fixing the degree of murder, and, as the jury are judges of the facts, why may they not infer or find the first degree, if they think it proper? Could the defence ask that the jury be told that from the use of a deadly weapon they could not find deliberation and premeditation? I think not.

And, again, there was no appearance of provocation. And there was before the jury not simply the isolated fact that a deadly weapon was used, but also the number of blows, their character, the fact that it was the prisoner's wife, and that the blows were delivered when she was lying down, and delivered on a mortal part of the body.

These being the circumstances, was it error, in law, to tell the jury they might find the presence of willfulness, deliberation and premeditation from the use of a deadly weapon? If there be a homicide, and it be with a deadly weapon, and the jury should find it to be murder in the first degree, could a court set aside the verdict as without sufficient evidence? I think not. Then an instruction that they may infer willfulness, deliberation and premeditation from the use of such a weapon can not be erroneous. If a man shoot another with a gun, what does he mean? We may say he intends to kill. Using a deadly weapon, he is taken to intend the reasonable, natural consequence of his act. *Cain's Case,* 20 W. Va. 681; *Hills Case, supra; Murphy's Case,* 23 Gratt. 960. The use of a deadly weapon has always been treated by courts as a material circumstance or factor in passing on the degree. *Cain's Case, supra; Hill's Case, supra; Mitchell's Case,* 33 Gratt. 878; *Wright's Case,* Id. 895; *Wright's Case,* 75 Va. 920; *Jones's Case,* 1 Leigh, 598. And in *Honesty's Case,* 81 Va. 295, Judge RICHARDSON says:

"It is clear that a jury may presume premeditation from the giving of a mortal blow with a deadly weapon in the previous possession of the slayer, leaving him, as this instruction leaves him, to repel the presumption by proof of extenuating circumstances."

I can not, therefore, see why a jury may not from its use deduce or find murder in the first degree, and so be told by the court. The jury was not told by this instruction that, where one person kills another with a deadly weapon, it is willful, deliberate, and premeditated; had it done so, it would likely be error. But it simply leaves it to the jury to say whether, from the use of such a weapon, it was murder in the first or second degree.

In connection with this instruction it is pertinent to say that no particular length of time for deliberation or premeditation is necessary to constitute murder in the first degree. *Whiteford's Case*, 6 Rand. 721; note to *King's Case*, 2 Va. Cas. 84.

"To constitute willful, deliberate, and premeditated killing, constituting murder in the first degree, it is not necessary that the intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that said intention should come into existence, for the first time, at the time of such killing, or any time previously." *Wright's Case*, 33 Gratt. 880; *Id.* 75 Va. 914.

Moreover, we should along with this instruction read the fifth instruction, which, with special and particular reference to murder in the first degree, combines the element of provocation, and taking both instructions the jury could not have misunderstood the subject, and the first instruction could not have misled the jury.

"Fourth Instruction. There is no particular period during which it is necessary that the malice should have existed or the prisoner should have contemplated the homicide. If the intent to kill is executed the instant it springs into the mind, the offence is as truly murder as if it had dwelt there for a longer period."

What has just been stated, and the cases last cited, render it unnecessary to say more in support of this instruction.

"Fifth Instruction. A man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act; and if the prisoner, with a deadly weapon in his possession, without any, or upon very slight, provocation, gives to another a mortal wound, the prisoner

is *prima facie* guilty of willful, deliberate, and premeditated killing, and the necessity rests upon him of showing the extenuating circumstances, and unless he proves such extenuating circumstances, or the circumstances appear from the case made by the State, he is guilty of murder in the first degree."

This instruction is in the exact language of point 11 of the syllabus in *Cain's Case*, 20 W. Va. 681, and is supported by *Hill's Case*, 2 Gratt. 595 and *Honesty's Case*, 81 Va. 292, 295.

"Eighth Instruction. If the jury believe from the evidence that the prisoner struck the blow, with a deadly weapon in his possession, that killed the deceased, and at the time he so struck the blow he was insane, and that insanity was remotely caused by habitual drunkenness, then he is excusable. But if the jury believe from the evidence that the blow, with the deadly weapon in his possession, which killed the deceased, was struck by the prisoner while he was in a fit of intoxication, and that such intoxication was voluntary on his part, and that such act was the immediate result of such fit of intoxication, and was done while it lasted, even though he was insane at the time, if this insanity was one of the results of that intoxication and one of the attendants on that state, he is still responsible in point of law, and must be punished."

The principles of law propounded by this instruction will be found stated in *Robinson's Case* 20 W. Va. 713 and *Boswell's Case*, 20 Gratt. 860. I do not think that the criticism of counsel is tenable, that this instruction assumes that the blow with a deadly weapon which killed the deceased was in prisoner's hands, and that he struck it. If this were so, the instruction would be bad; but it leaves those matters to the jury. Instructions should assume no important fact in the case. *Cain's Case*, 20 W. Va. 681, point 11 of Syllabus. If this instruction assumes anything, it assumes that the deceased was killed, and killed by a deadly weapon. The evidence makes those facts so overwhelmingly clear and uncontradicted that no one can question them; and it necessitates the inference that they were undisputed or tacitly admitted on the trial, and so they seem to have been, and

therefore the assumption of those facts will not hurt the instruction. *Douglass's Case*, 28 W. Va. 297; *Sheff* v. *Huntington*, 16 W. Va. 307. Taken in its entirety, I do not think the eighth instruction assumed anything important, but left the entire hypothesis to the jury.

As to the motion for a new trial because the verdict was without sufficient evidence, especially not sufficient to warrant a finding of murder in the first degree, I shall not detail the voluminous evidence or facts touching the murder, or the prisoner's agency in it, as such evidence would not be a precedent for future trials, perhaps could not be properly used therein.

The prisoner's guilt was peculiarly a question for the jury, and we not only can not say that the evidence is not sufficient, but are of opinion that it fully warranted a verdict that the prisoner was the murderer of his wife.

So also was the question of the degree of the prisoner's criminality one properly for the consideration of the jury. If there could be found in the record any ground for pause upon the question whether he was rightly found guilty of murder in the first degree, it would be in the fact that he was intoxicated at the time of the commission of this bloody and cruel murder. His intoxication was voluntary and immediate. In case of such intoxication it is admissible in evidence on trials for homicide as bearing on the inquiry whether the accused was unable, because of his intoxication, to deliberate, so as to be responsible as for murder in the first degree.

Great caution is necessary in the application of this doctrine for even this purpose; because often, in cases of premeditated murder, the murderer purposely nerves himself for the dire deed by liquor; and there would in future be no cases of premeditated, deliberate homicide, if the fact that being in liquor at the time is enough to disprove the existence of premeditation. 1 Whart. Crim. Law, § 48; *Willis's Case*, 32 Gratt. 929.

This Court, in *Robinson's Case*, 20 W. Va. 713, has held that "a person who is intoxicated may yet be capable of deliberation and premeditation; and if the jury believe from all the evidence in the case that the prisoner willfully, ma-

liciously, deliberately, and premeditatedly killed the deceased, they should find him guilty of murder in the first degree, although he was intoxicated at the time of the killing."

In *Honesty's Case*, 81 Va. 283, the Virginia Supreme Court held that the *onus* rests on the accused, if he relies on intoxication, to prove that when he committed the offence his condition from intoxication was such as to render him incapable of doing a willful, deliberate, and premeditated act. The questions, what was the decree of the crime and whether the prisoner was, by intoxication, disabled from premeditating and deliberating, were presented to the jury, and the trial court has approved their finding, and we see no ground for reversing their action on this score.

For these reasons the judgment sentencing the prisoner to the penitentiary for his life must be affirmed.

AFFIRMED.