NATHAN A. GREENFIELD, Plaintiff in Error, *v.* THE PEOPLE OF THE STATE OF NEW YORK, Defendant in Error.

Upon the trial of an indictment for murder, a witness for the prosecution having testified that, the morning after the murder, he saw, near the house of the prisoner, where the murder was committed, and in the path between it and the house of the prisoner's father, to which he went, spatters or spots upon a stone, and after the witness had stated that he could testify, as a matter of fact, what the spots were, he was asked so to state. This was objected to as irrelevant, and that the witness was not an expert, and was not competent to express an opinion. The objection was overruled ; the court, however, stated to the witness that his opinion was not requested, and he would only be allowed to answer

as a fact what the substance was. The witness answered that it was blood. *Held*, that the admission of the evidence was not error; that the fact that blood-stains were found in the path the prisoner probably took, was material and competent; and that the witness, although not an expert, was competent to testify to the fact.

The person killed was the wife of the prisoner. Evidence was received under objection, and exception as to the prisoner's conduct on the morning after the homicide, *i. e.*, that he shed no tears, and showed indifference. *Held*, no error.

A letter written by one K., to his brother, containing statements which were claimed by the prisoner's counsel to be admissions that he, K., committed the murder, was offered in evidence on behalf of the prisoner, and was excluded. *Held*, no error.

So, also, *held* as to an anonymous letter written to the sheriff, in which the writer confessed to having committed the murder.

A witness for the defense testified that on the night of the murder he stayed at a house about three-fourths of a mile from the house of the prisoner; that he was awakened by the barking of a dog about 4 A. M., that he got up and went to the window, where he saw the two K.'s and one T. The prisoner's counsel then offered to prove that the witness heard T. say: "You were damned fools to do it;" to which one of the K.'s answered: "If we had not done it, we should all have been hung." This was objected to and excluded. Both of the K.'s were in court during the trial. *Held*, no error; that, in the absence of other evidence connecting either of the three with the murder, no proper presumption of any such connection could be drawn from the testimony excluded.

The court, in its charge, having submitted certain facts to the jury as circumstances proper to be considered against the prisoner, the prisoner's counsel asked the court, but declined to charge, that they could not be so considered. After the charge, an adjournment was had for dinner, and immediately upon the convening of the court thereafter, it sent for the prisoner and the jury, and directed the latter to exclude from their consideration the evidence relating to said facts, and to give it no weight whatever. *Held*, that if there was error in the charge, or in the refusal to charge, it was cured by the subsequent instructions.

(Argued March 3, 1881 ; decided April 19, 1881.)

ERROR to the General Term of the Supreme Court, in the fourth judicial department, to review a judgment of the Court of Oyer and Terminer, in and for the county of Onondaga, entered upon a verdict convicting the plaintiff in error of the crime of murder in the first degree. (Reported below, 23 Hun, 454.)

The material facts appear in the opinion.

*S. C. Huntington* for plaintiff in error. The court erred in admitting the evidence as to blood-stains. The prisoner was not legally bound to account for them and could not be held liable for them. In the absence of proof that he caused them they neither proved nor tended to prove his guilt. (1 Greenleaf's Evidence [13th ed.], §§ 49, 56 ; Starkie on Evidence [10th ed.], 617–624 ; *Lightfoot* v. *The People*, 16 Mich. 507.) The only evidence these witnesses were, from the very nature of the case, competent to give was to describe the color and appearance of the stains ; and, if they had seen stains that they knew to be blood under similar circumstances, to state that in color and appearance it resembled stains they had seen made by blood. (*Major* v. *Spies*, 66 Barb. 576 ; *Mark* v. *The People*, 17 Hun, 410 ; *Messner* v. *The People*, 45 N. Y. 104 ; *The People* v. *Rector*, 19 Wend. 569 ; *Wilson* v. *The People*, 4 Parker, 619 ; *Van Zandt* v. *Mut. Ben. L. Ins. Co.*, 55 N. Y. 169 ; *Haggerty, by Guardian,* v. *The B'kln City & Newton R. R. Co.*, 61 id. 624 ; *Morehouse* v. *Mathews*, 2 id. 514 ; *Sloan* v. *N. Y. C. R. R. Co.*, 45 id. 125 ; 2 Best on Evidence [Wood's ed.], §§ 511–517 and note *a ;* Wharton & Stille's Medical Jurisprudence, [2d pt., 3d ed.], §§ 724–770 ; Taylor's Medical Jurisprudence, by Reese [7th Am. ed.], 291–300 ; Forensic Medicine, Guy & Ferrier, 321–334 ; Trial of Webster [Rev. ed. 1879], 131, 132 ; *De Witt* v. *Barley*, 5 Seld. 371 ; 29 N. Y. 27 ; *Nelson* v. *Sun Mut. Ins. Co.*, 71 id. 453–460 ; *Lane* v. *Wilcox*, 55 Barb. 615 ; *Rust* v. *Eckler*, 41 N. Y. 488 ; Wills on Circumstantial Evidence, 174, 188, 189 ; *Vandervoort* v. *Gould*, 36 N. Y. 644 ; Wharton on Homicides [2d ed.], 683–686.) The court erred in receiving evidence as to the conduct of the prisoner the day after the murder. (1 Wharton & Stille's Medical Jurisprudence, §§ 426–428 ; Bush on the Mind, 40, 346, 347 ; Doctor Cheyne on Derangement in Connection with Religion, 107 ; Marshall's Physiology, 419 ; *Gibson* v. *Am. Life Ins. Co.*, 37 N. Y. 580 ; 1 Greenleaf's Evidence [13th ed.], §§ 12, 13, 52 ; Mental Physiology by W. B. Carpenter [1874], 324–330, §§ 365–369 ; The Emotions, by James McCosh, Prest. of Princeton College, 89, 90, 94, 95 ;

The Emotions and Will, by Alexander Bain, LL. D. [3d ed.], 26, 27, 31, 36, 41–45, 359–363.) Under the circumstances, the letters and conversations offered in evidence should have been admitted as constituting a part of the *res gestæ*, and as being matters of the utmost importance to the defense. (1 Greenleaf's Evidence, §§ 90, 100, 108, 109, 111, 114, 124, 125, 135, 138, 139, 147–155, 156–160, 169, 181, 251; *Commonwealth* v. *McPike*, 3 Cush. 181; *Ins. Co.* v. *Morley*, 8 Wall. [U. S.] 397; *Jordan* v. *Case*, 25 Gratt. [Va.] 943; *Mundy* v. *The State*, 32 Ga. 672; *Hart* v. *Powell*, 18 id. 635; *Roach* v. *Learned*, 32 Me. 110; *Dobbs* v. *Justice*, 17 Ga. 624; 1 Wharton's Evidence, §§ 259–266; *Mobile R. R. Co.* v. *Ashcraft*, 48 Ala. 15; 2 Best on Evidence, §§ 175, 258; *Casey* v. *N. Y. C. & H. R. R. R. Co.*, 78 N. Y. 518; *Brownell* v. *Pacific R. R. Co.*, 49 Mo. 239; *Lambert* v. *The People*, 29 Mich. 71; *Week* v. *Perry*, 36 Miss. 109; *The People* v. *Roach*, 19 Cal. 297; Starkie on Evidence [10th ed.], 78, 87–90; 1 Phillips' Ev. [Cow., H. & D. notes], [ed. 1859] 185–188, 202, 203.) The court erred in refusing to charge as requested that certain facts and circumstances should not be considered against the prisoner, and this error was not cured by the court directing the jury after the adjournment to exclude from their consideration the evidence as to such facts and circumstances. (1 R. S. [6th ed.] 31, note 1, p. 82; Art. 1, § 6, note 1, p. 83; 3 R. S. [6th ed.] 1000, § 15, p. 1032; *Ruloff* v. *The People*, 45 N. Y. 213, 221; *Crandall* v. *The People*, 2 Lans. 309, 313; *Commonwealth* v. *Scott*, 123 Mass. 239; 25 Am. Rep. 87; *Commonwealth* v. *Nichols*, 114 Mass. 285; 19 Am. Rep. 346; 110 Mass. 411; *State* v. *Commonwealth*, 65 Miss. 374; 27 Am. Rep. 291; *The People* v. *McCoy*, 45 How. Pr. 216; *Myer* v. *Clark*, 45 N. Y. 285; *O'Sullivan* v. *Roberts*, 7 J. & Sp. 360; *Furst* v. *Second Ave. R. R. Co.*, 72 N. Y. 542; *Erben* v. *Lorillard*, 19 id. 299; *Green* v. *White*, 37 id. 405; *Duffany* v. *Ferguson*, 66 id. 482; *Smith* v. *Isaacs*, 58 id. 680; *Bayard* v. *Daily*, 68 id. 547; *Brague* v. *Daily*, 67 id. 495; *Hydorn* v. *Cushman*, 16 Hun, 107; *Lambert* v. *The People*, 6 Abb. N. C. 181; *The People* v. *Willy*, 3 Hill, 194–214; *Traver* v. *Eighth Ave. R. R. Co.*,

Statement of case.

3 Keyes, 497; *Allen* v. *James*, 7 Daly, 13; *Newman* v. *Goddard*, 48 How. Pr. 363; *Ferguson* v. *Lord*, 67 id. 495; *Wright* v. *Eq. L. Ins. Co.*, 9 J. & Sp. 1; *Com.* v. *Scott*, 123 Mass. 239; 25 Am. Rep. 87; *Com.* v. *Nichols*, 114 Mass. 239; 19 Am. Rep. 346; *Com.* v. *Hollow*, 110 Mass. 411; *State* v. *Com.*, 65 Mo. 374; 27 Am. Rep. 291; *Baird* v. *Gillett*, 47 N. Y. 186; *Williams* v. *Fitch*, 18 id. 566; *Osgood* v. *Manhattan Ins. Co.*, 3 Cow. 612; *Worrall* v. *Parmela*, 1 Com. 519; *Starbird* v. *Barrows*, 43 N. Y. 200; *Arthur* v. *Griswold et al.*, 55 id. 400, 408; *Green* v. *Hud. R. R. R. Co.*, 32 Barb. 25, 34; *Coleman* v. *The People*, 58 N. Y. 561, 562; *Scribbs* v. *Reilly*, 35 Mich. 371; 24 Am. Rep. 575, 582, 583; 6 Hill, 292; *Carnes* v. *Platt*, 6 Robt. 270, 281; *Traver* v. *Eighth Ave. R. R. Co.*, 6 Abb. [N. S.] 46, 49 [Court of Appeals]; 3 Keyes, 497; *Watertown Bk. & Loan Co.* v. *Mix*, 51 N. Y. 558; *Brown* v. *Swinford*, 44 Wis. 282; 28 Am. Rep. 582.)

*Wm. C. Ruger & B. F. Chase* for defendant in error.   The evidence as to the blood-stains was competent. (*People* v. *Gonzales*, 35 N. Y. 49; *Com.* v. *Dorsey*, 103 Mass. 412; *People* v. *Eastwood*, 14 N. Y. 563; *Clapp* v. *Fullerton*, 34 id. 190.) The evidence establishing the absence of physical demonstrations of grief, after the murder on the part of the accused, was also competent.   (*McCann* v. *People*, 3 Park. Cr. 273; *People* v. *Hendrickson*, 8 How. Pr. 412, 413; affirmed, 10 N. Y. 12; Roscoe's Criminal Evidence, *18; Burrill on Circ. Evidence, 502; *Standsfield's Case*, 11 Howell's St. Trials, 1398; *McKee* v. *Nelson*, 4 Cow. 355; *Trelawney* v. *Coleman*, 2 Stark. 191; *Culver* v. *Dwight*, 6 Gray, 444; *Lindsay* v. *People*, 63 N. Y. 115.)   The letters purporting to be in the handwriting of Royal Kellogg, and alleged to contain a confession that he murdered Alice Greenfield, were properly rejected.   (2 Best on Ev., §§ 559, 560, 563, 565, 570; 1 Wharton's Am. Cr. Law, § 684; *Snow* v. *State*, 54 Ala. 138; 58 id. 372; *State* v. *Duncan*, 6 Iredell [Law], 236.)   The declarations of third parties are *res inter alios acta*, and are therefore incompetent, being mere hearsay.   (*Carter* v. *Buchanan*,   Ga. 813; Wharton's Cr.

Ev., § 262; *Enos* v. *Tuttle*, 3 Conn. 250; *Moore* v. *Meacham*, 10 N. Y. 210; *Rockwell* v. *Taylor*, 41 Conn. 56; 1 Greenleaf on Ev., § 110; *Meek* v. *Perry*, 36 Miss. 190; *Riggs* v. *State*, 6 Cold. 517; *People* v. *Davis*, 56 N. Y. 95–162; *Luby* v. *Hudson R. R. R. Co.*, 17 id. 131; *Ins. Co.* v. *Moseley*, 8 Wall. 405; *People* v. *Symonds*, 19 Cal. 285; Taylor on Evidence, § 526; *Lund* v. *Tyngsborough*, 9 Cush. 36; *White* v. *Miller*, 71 N. Y. 118; *Anderson* v. *R., W. & O. R. R. Co.*, 54 id. 334; *Maine* v. *People*, 9 Hun, 113; *Conn* v. *Harwood*, 4 Gray, 41; *Rockwell* v. *Taylor*, 41 Conn. 56; *State* v. *Haynes*, 71 N. C. 79; *State* v. *White*, 68 id. 158; *Riggs* v. *State*, 6 Cold. 517.) The charge, to the effect that the prisoner's refusal to answer the question of the coroner was not a circumstance to be considered against the prisoner, unless accompanied by the statement made by him to the prisoner that, if he were innocent he might answer any question, if not, that it were better that he answered none, was a correct statement of the law. (1 Wharton on Ev., § 546; *Connors* v. *People*, 50 N. Y. 230; *Stover* v. *People*, 56 id. 315; *McGeary* v. *People*, 2 Lans. 232; *People* v. *Casey*, 72 N. Y. 493.) Where an error occurs in admitting incompetent evidence, or in giving improper instructions to a jury, the error may be cured, even after an exception has been taken, by striking out the objectionable evidence, and directing the jury to disregard it, or, in case of an erroneous charge, to disregard the charge. (*Lindsay* v. *People*, 67 Barb. 549; affirmed in 63 N. Y. 143; *People* v. *Parish*, 4 Den. 156; *Smith* v. *Maxwell*, 1 Stewart & Porter [Ala.], 221; *Clay* v. *Miller*, 3 T. B. Mon. 146; *Inhoff* v. *Chicago, etc., R. R. Co.*, 22 Wis. 348; *Eggler* v. *People*, 56 N. Y. 642.) A court has the power at any time during the trial to modify instructions already given, or revoke them entirely, if, upon reflection, it concludes that they are erroneous. (Thompson on Charging Juries, § 93; *Sitting* v. *Breterstach*, 38 Md. 158; *Jones* v. *Talbot*, 4 R. I. 279, 285; *Com.* v. *Snelling*, 15 Pick. 321, 333; *Eggler* v. *People*, 56 N. Y. 642; *Clay* v. *Miller*, 3 T. B. Mon. 146.)

MILLER, J. The writ of error in this case brings up for review a judgment upon the conviction of the prisoner for the crime of murder in the first degree, in killing his wife, at a Court of Oyer and Terminer held in the county of Onondaga, the place of trial having been changed to this county from the county of Oswego, where the offense was committed. There was no positive proof that the prisoner committed the offense, but the testimony established facts and circumstances which tended strongly to prove his guilt and called upon the jury to determine the weight which should be given to the evidence adduced upon the trial. It appeared that the prisoner and his wife had been married about four years and their matrimonial life had been marred by jarring discords and quarrels and characterized by violence and cruelty of Greenfield toward his wife. She had threatened to leave him, in consequence of his bad conduct, and he had an interview with her about twelve o'clock of the night of the murder in relation to that subject at his own house. He then, as he testified, proceeded from there to his father's residence and went to bed, which was unusual and contrary to his accustomed habit. He swore also that he saw a light in his house during the night, dressed himself and proceeded to the house, which was some twenty-one and a half rods distance from his father's, looked into the window and saw a man by the name of Hinds, with a lamp there. Immediately he returned to his father's, called him up, and also an uncle who lived in the neighborhood, told what he had seen and all of them together went to the house of the prisoner. The light in the meantime had disappeared and upon entering the house the deceased was found dead. There were indications of a severe blow from a piece of board which was apparently broken from the force used, from the eye-brows to the hair of the deceased, and her throat was cut from ear to ear, severing the artery, jugular vein and the nerves, and blood was on the wall and a quantity upon the floor. A knife of the prisoner was found on a shelf in the pantry which had blood upon it which was not yet dry. An army overcoat, which it was proved he had worn on that night, was not found, and

there were other circumstances, which tended to establish that he was the offender, not necessary to be stated.

The questions raised upon the trial related to the rulings of the judge as to the testimony and the instructions given by him to the jury, and these will be duly considered. *First.* Upon the trial a witness — one Stevens — was sworn and testified that about ten o'clock on the forenoon of the day of the murder, about one-half way distant from the defendant's house to the road leading past and near and about two rods west from the defendant's house, he saw a spatter or spot on a flat stone in the path, which stone was from three to five inches across; that there were a few drops or spatters from the size of a hay-seed to a kernel of wheat, of a darkish red color; and that he was able to state what that substance was. The question was then put to him as follows: "State what that substance on the stone was?" This was objected to as irrelevant and incompetent, and upon the ground that the witness is not competent to express an opinion as to whether it was blood or not, and was not an expert. The witness was then informed by the court, before he was allowed to answer, that his opinion or judgment was not requested; but if he answered he could only be allowed to answer as a fact what the substance was. He stated that he could so answer and the court held that he might answer, but that his opinion should not be taken. The witness answered that he could swear as a matter of fact what it was, and an exception was taken to the ruling of the court by the prisoner's counsel. The witness also answered, the spots were blood, and further testified that he saw stains or spots on the handle, also on the platform of the pump, about two rods in front of the dwelling-house of Richard Greenfield, the father of the prisoner, about the same time. Other questions were put of a similar character as to the last stains and the same objections urged; and the same ruling had, exception taken and evidence given. Upon his cross-examination the witness testified that his business was working on a farm and trapping pigeons, that he was not a chemist, and had no experience in examining blood stains. Evidence

of a similar character was also offered and given by one Pen-
nock, who testified that he was a farmer, had no practical ex-
perience as to blood stains on wood, iron or hemlock plank;
that he had butchered a good deal and hunted and caught
pigeons, and the same objection was made, ruling had and ex-
ception taken by the prisoner's counsel. It also appeared from
the evidence that the prisoner, in going from his house to his
father's, would pass over or near the places where the alleged
blood stains were found.

The defendant's counsel insists, first, that he was not legally
bound to account for the stains of blood, and that in the ab-
sence of proof that he caused them, they neither proved nor
tended to prove his guilt; second, that a person who is not an
expert cannot be allowed to testify as to a matter of fact
whether the stains described were blood. As to the first ground,
we think that the fact that blood stains were found along the
road and in the course of the route over which the prisoner
would have been obliged to and most probably would have
passed on his way to his father's house, was a circumstance
which tended to prove the issue and constituted an important
link in the chain of evidence to establish his guilt. There was
blood in the house, and that it was found elsewhere in the
vicinity, where he may have been, evinced, with the disappear-
ance of the coat which he wore, that it may have dripped from
this garment or some part of his person. There is no rule of
evidence which excludes such proof, where the circumstances
tend to establish guilt. In regard to the second ground, we
think that the witnesses were competent to testify upon the
subject whether the spots described were blood, without decid-
ing the question whether an opinion of the witnesses would have
been competent. Under the circumstances, it is sufficient to
say that the testimony was only received after the witnesses
had shown some knowledge on the subject as a matter of fact.
The question was not whether it was human blood, and no ob-
jection was taken on this ground, but what the character of the
substance was. It is not difficult to perceive that there are
many substances which are commonly known, in regard to

which a witness may testify, although he is unacquainted with their ingredients or chemical properties.   Many of these would be more familar to those who had occasion to notice them frequently than to others, and hence they could testify more directly and positively in regard to the same.   But to hold that no one but an expert or a scientific person should be allowed to speak on such subjects, would be establishing a stricter rule than is authorized by law.   While, then, inexperienced persons and those comparatively ignorant may be able to testify in reference to such substances, the weight to be given to their evidence must of course, depend upon the circumstances and their knowledge of the matter.   The existence of blood in large quantities, and where the stains are recent and marked, may be distinguished by most persons; and while it is more difficult to discover the character of a few drops or a smaller quantity, it does not necessarily follow that those who from experience and observation have become familar with the appearance of blood cannot testify to its reality as a matter of fact.   We have given due consideration to the able argument of the prisoner's counsel, to the effect that uneducated and ignorant men are incompetent to testify under the circumstances, and that it is alone within the province of experienced and scientific experts to give evidence on the subject; but we are after careful investigation brought to the conclusion, that in many instances the ordinary mind may be able to determine from observation and experience the character of such stains; and in this case the witnesses who testified had sufficient knowledge to speak on the subject.   The line is often a close one between a matter of fact and an opinion, but we are of the opinion that the witnesses sworn were competent to prove the existence of blood as a matter of fact.   Nor are we without authority upon the question.   In *The People* v. *Gonzalez* (35 N. Y. 49), it was held that stains of blood upon the person and clothing worn by the accused on the night of the murder may be shown by persons who are not experts, and matters of common observation may ordinarily be proved by those who witness them, without resorting to scientific or mechanical

tests to verify them with definite precision.  It is said in the
opinion by PORTER, J.:  " The testimony of the chemist who
has analyzed blood, and that of the observer who has merely
recognized it, belong to the same legal grade of evidence; and
though the one may be entitled to much greater weight than
the other, with the jury, the exclusion of either would be
illegal."  In the case last cited testimony had been given to
the effect that blood was on the clothes of the prisoner, and we
think it must be regarded as an authority in point.  (See, also
*Comm.* v. *Sturtivant*, 117 Mass. 122, 132 ; *People* v. *Eastwood*,
14 N. Y. 562.)  The cases cited by the counsel for the prisoner
have been carefully examined, and none of them establish the
principle that the evidence introduced was incompetent.  The
conclusion, therefore, is a rational one, that in matters of com-
mon observation, where persons have special opportunity to
learn from the nature of their avocations or otherwise, although
not strictly experts, their conclusion as to a fact is admissible,
the weight to be given to the evidence being governed by the
circumstances, and by the experience and knowledge of the
witness as to the subject matter of the inquiry.

*Second.*  Upon the trial evidence was adduced to show the
prisoner's conduct on the morning after the homicide, and a
number of witnesses were asked whether they saw him shed
tears, and answered that they did not.  Objection was duly
taken to the testimony, which was overruled, and the prisoner's
counsel excepted to the decision.  One witness swore that he
did see him weep on that day, and there was evidence showing
that upon its being said to him by one of the witnesses that it
was a sad affair which occurred at his house, he replied, " Yes,
I had a load of oats stolen."  Another witness testified that he
appeared to be indifferent as to his wife's death.  The object
of the testimony objected to evidently was to establish that the
prisoner did not manifest that degree of feeling and sensibility
which was usual on such occasions, and that he was not es-
pecially moved or affected by his wife's death.  The acts and
conduct of a party at or about the time when he is charged to
have committed a crime, are always received as evidence of a

guilty mind, and while in weighing such evidence ordinary caution is required, such inferences are to be drawn from them as experience indicates is warranted. (Roscoe's Cr. Ev. 21, 22.) And the demeanor of a prisoner at the time of his arrest, or soon after the commission of the crime, or upon being charged with the offense, is a proper subject of consideration in determining the question of guilt. Such indications, however, are by no means conclusive, and must depend greatly upon the mental characteristics of the individual. Innocent persons, appalled by the enormity of a charge of crime, will sometimes exhibit great weakness and terror, and those who have been crushed with the weight of a great sorrow will manifest the greatest composure and serenity in their grief, and meet it without the shedding of a tear. While the manifestations at such a time sometimes indicate excitement and great disturbance of the physical system, and do not always sanction an inference of guilt, they are admissible evidence for the jury to pass upon, in view of the circumstances. (*Lindsay* v. *The People*, 63 N. Y. 143.) The conduct of a prisoner under such a trying ordeal is to be weighed by the jury, and it is for them to determine whether it is contrary to the ordinary behavior of a person charged with crime, or to be attributed to his mental characteristics, or evinces guilt or innocence. Under well-established rules, the evidence objected to was competent for what it was worth, and there was no error upon the trial in its admission.

*Third.* There was, we think, no error in excluding the letter proved to have been written by Royal Kellogg to his brother. The letter, among other things, contained the following language : " Tell me all about the murder. If you think it all right, tell them I am in Lafayette, and if they want me they can come and get me." Even if this letter could be regarded as a confession of Kellogg that he committed the murder, it was only the declaration of a third party, merely hearsay testimony, and upon no rule of evidence admissible. If such declarations were competent upon any trial for homicide, they would tend clearly to confuse the jury and to divert their attention from the real issue. The letter did not tend to estab-

lish that Kellogg committed the offense, was not a part of the *res gestœ*, and in no sense relieved the prisoner from the charge for which he was upon trial, or raised any presumption that Kellogg was the guilty party. Confessions of this character are sometimes made to screen offenders, and no rule is better established than that extra judicial statements of third persons are inadmissible. (Wharton on Ev., § 644; Wharton's Cr. Law, §§ 662, 684; 2 Best on Ev., §§ 559, 560, 563, 565, 578.) For similar reasons, the anonymous letter directed to the sheriff, in which confession was made of the murder, was properly excluded.

In connection with the questions last considered and under the same general head, the learned counsel for the prisoner claims that there was error in the exclusion of the declarations of John Taplin to Alden and Royal Kellogg offered to be shown upon the trial by one Wyman. The witness had testified that he stayed at the house of Taplin, who was his son-in-law, on the night of the murder, which was three-fourths of a mile, from the prisoner's house. He was awakened by the barking of a dog about four o'clock in the morning. He got up, looked out of the window, saw three men, who had a bottle, out of which they drank. They were Taplin and the two Kelloggs. They had a double-barrel gun and a bag with something in it. One went to the pump and washed his hands. Alden Kellogg had the gun, and Taplin the bag. Taplin got a coat and put it on, took off his coat, went and got a coat from the horse barn, which Royal Kellogg put on; one of the Kelloggs took away the gun and bag. Taplin went into his house. The prisoner's counsel offered to prove that Taplin said to the Kelloggs on that occasion before they left : " You were damned fools to do it ; " and one of the Kelloggs replied : " If we had not done it we should all have been hung." This was objected to, the testimony excluded and an exception taken. There was no other testimony which in any way tended to connect the Kelloggs or Taplin with the events of that night. On the contrary, the probability of such a theory was rebutted by the version of the prisoner that he saw Hinds in his house

just preceding the homicide, by proof that the Kelloggs were in bed at the time all night, and the testimony of several witnesses to the effect that Taplin and his family were then visiting his father, some twenty-seven miles from his residence, and did not return until the day after the murder, although there was much conflict in the testimony as to the last-named fact. It should also be stated in this connection that Royal and Alden Kellogg were both in court during the time when the evidence for the prosecution and the defense was given, and neither of them was called as a witness. The testimony, however, on this branch of the case, so far as it was contradictory, was a matter for the consideration of the jury, and the question arises whether the evidence had any bearing upon the issue upon trial. It is claimed that it was admissible, inasmuch as it tended to raise a presumption that the Kelloggs and Taplin were the murderers, and as a part of the *res gestæ*, in connection with the letters which have been already considered. Wharton in his work on Criminal Evidence, § 262, says : "*Res gestæ* are events speaking for themselves through the instinctive words and acts of participants * * * when narrating the events ; what is done or said by participants under the immediate spur of a transaction becomes thus part of the transaction because it is then the transaction that thus speaks." The rule, no doubt, is that to constitute declarations a part of the *res gestæ*, they must be made at the time when the act was done to which they relate and which they are considered as characterizing, and must so harmonize as to be obviously a part of the transaction. (*Moore* v. *Meacham*, 10 N. Y. 210 ; *Enos* v. *Tuttle*, 3 Conn. 250 ; *Rockwell* v. *Taylor*, 41 id. 56.) Nor must they be narratives of past occurrences, but concomitant with the principal act, and so connected with it as to be regarded as the result and consequence, or as a part of the act itself, and presumed to have been induced by the motive which led to its commission. (1 Greenl. Ev., § 110 ; *People* v. *Davis*, 56 N. Y. 95 ; *Luby* v. *H. R. R. R. Co.*, 17 N. Y. 131 ; *Ins. Co.* v. *Mosley*, 8 Wall. 405.) As was said in the last case cited, they must be contemporaneous

with the main fact to which they relate. In fact they must directly relate to the transaction, or be proved as so intimately connected with it and near to it in point of time, that it is manifest that they emanate from and constitute a component part of the same. Having these rules in view, it is not apparent that the declarations offered to be proved were identified with and constituted a part of the homicide. The murder occurred between the hours of one and three o'clock, some distance from the place where the alleged declarations were made. There is no proof that the Kelloggs or Taplin were there, and on the contrary, as we have seen, the testimony of the prisoner was to the effect that Hinds, and not the Kelloggs or Taplin, were in the house at the time. Nor was it proved that either the bag or gun was taken from the prisoner's house, or that the persons named had any motive for the commission of the crime or any complicity with the murder, and there was no circumstance in the case from which the jury might draw the inference that they had. Aside from the fact that the Kelloggs and Taplin were not otherwise implicated, the declarations offered to be proved would not tend to prove their guilt of the homicide. The statement offered was that they would be hung if they had not done it, while on the contrary they were liable to this penalty if they had killed Mrs. Greenfield. It would not, therefore, be proof that they had committed this offense, nor was it a direct or implied admission that they had. Such evidence can in no sense, we think, be regarded as a part of the *res gestœ*. While evidence tending to show that another party might have committed the crime would be admissible, before such testimony can be received there must be such proof of connection with it, such a train of facts or circumstances as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose. In considering the question, we have carefully examined the numerous authorities cited to sustain the position that the evidence was competent, and none of them hold that under such circumstances it could lawfully be received, and it

was neither admissible alone or in connection with the letters referred to.

*Fourth.* Upon the trial the prisoner's counsel excepted to that portion of the charge which stated "that .if the prisoner declined to answer questions after he was arrested, that 'fact, taken in connection with the evidence of Hiram Snow, might be considered by the jury as a circumstance against the prisoner." The court was then asked to charge that this could not be so considered, but declined, and 'the defendant's counsel excepted. After the charge was delivered, the court and jury went to dinner, and as soon as it was over the judge returned to the court-house, and, upon the court being convened, the prisoner and jury were sent for, and the judge withdrew the whole subject of that portion of the charge which was excepted to from the jury, and directed them to exclude from their consideration the evidence relating to the same, and to give it no weight whatever. Without considering the question whether there was any error in the portion of the charge excepted to or in the refusal to charge as requested, we are of the opinion that if there was error in the charge as originally made, it was obviated by the subsequent instructions to the jury. This doctrine is fully upheld in the reported decisions and its propriety fully recognized. The rule is well settled that where a judge, in charging the jury, lays down erroneous propositions, but, upon his attention being called thereto by objections, corrects the misdirection and lays down a correct rule, no error is presented for a review. (*Eggler* v. *The People,* 56 N. Y. 642; *Meyer* v. *Clark,* 45 id. 285. See, also, Thompson on Charging the Jury, § 93; *Sittig* v. *Birkestack,* 38 Md. 158; *Hall* v. *The State,* 8 Ind. 439; *Commonwealth* v. *Snelling,* 15 Pick. 321, 333, 334.) It is true that to obviate an erroneous instruction to a jury upon a material point, the withdrawal must be absolute, and in such explicit terms as to preclude the inference that the jury might have been influenced thereby. (*Chapman* v. *Erie Railway Co.,* 55 N. Y. 579.) The withdrawal here was unqualified and directly within the rule last stated. The numerous cases to which we have been referred in this con-

nection by the learned and indefatigable counsel of the prisoner have each received due consideration, and none of them, we think, are in conflict with the views expressed.

The unqualified direction to the jury, that they should not consider the refusal to answer questions as evidence to establish guilt, and should exclude it and give it no weight, clearly was sufficient to correct the error, if any had been committed, within the authorities cited, and was equivalent to charging as was requested by the prisoner's counsel. The jury could not have been long absent when the correction of the charge was made by the judge, and it is a legitimate presumption that in arriving at a conclusion that the portion of the charge which was objected to was not taken into consideration. Any other assumption would rest upon the theory that they were unable to discriminate and prevent the correction of all errors of a judge upon a trial into which he may have inadvertently fallen, which, as we have seen, would be in conflict with the decisions to which we have referred. We have given to the questions raised in the record before us that attentive examination which the magnitude and gravity of the offense charged and the consequences involved eminently demand, and we are brought to the conclusion that no error was committed upon the trial which would justify a reversal of the conviction.

The judgment, therefore, should be affirmed and the record remitted to the court below, with directions to proceed as required by law.

All concur.

Judgment affirmed.