## THE PEOPLE OF THE STATE OF NEW YORK, RESPOND-ENTS, *v.* JOHN KELLY, APPELLANT.

*Trial for murder in the first degree — when the question of premeditation and delibera-tion must be left to the jury — errors in the charge — when not cured by a subsequent modification thereof — defense of an alibi — it is error to charge that it is a suspicious defense — what evidence may be admitted to sustain the defense.*

The defendant was indicted and tried for murder in the first degree in killing one Lutz, from a deliberate and premeditated design to effect his death, and also for killing him while he, the defendant, was engaged in the commission of a felony. Upon the trial evidence was given tending to show that on the evening of October twentieth Lutz received ten dollars, being the wages for a week of himself and his son, and the defendant received at the same time from the same person two dollars for his wages; that at about one o'clock of the morning of the next day the defendant rapped at the door of the house where

Lutz and his son lived, was admitted by Lutz, and went to bed with Lutz and his son; that during the night the defendant assaulted Lutz and his son, beating them over the head with a blunt instrument and inflicting injuries upon Lutz from which he died; that he took the wages received by Lutz from the pocket of his waistcoat which hung by the side of the bed and appropriated them to his own use.

The court in its charge defined the crime of murder in the first degree, but made no mention of murder in the second degree, or manslaughter, stating that it thought it would confuse the jury to state all the different grades of murder or homicide, and then added: "There is not any opportunity, gentlemen, for you or me to compromise this case in any respect. It is a conviction of murder in the first degree or an absolute acquittal." Upon the defendant's exception to this charge the court said: "What I intended to say to you was that a verdict in this case other than that of guilty or not guilty would not, in my judgment, be borne out by the facts of the case. I say, however, to you that as a matter of right and power you can bring in a verdict of a lesser offense under an indictment charging murder in the first degree, and to that extent I modify my charge." He also charged that if they believed the testimony of the son, who related what occurred in the house, that "that alone is sufficient to enable you to find a verdict of guilty in this case."

*Held,* that as the taking of the money under the circumstances described did not amount to a felony but only to a larceny, and as the question of premeditation and deliberation was, under the circumstances, a question of fact for the jury, that the charge was erroneous.

That the error was not cured by the modification afterwards made to the charge

To obviate an erroneous instruction given by the court to a jury upon a material point, the withdrawal must be absolute and be made in such explicit terms as to preclude the inference that the jury might have been influenced thereby.

The defendant attempted to establish an *alibi* by showing that at the time the homicide was committed he was not near Lutz's house but was in the city of Rochester. The court charged that "an *alibi* is a species of defense which the law looks upon generally with great suspicion."

*Held,* that this was error.

A witness, sworn in behalf of the people, was asked on his cross-examination if he had been convicted of an assault and battery in 1875, and sent to the penitentiary for two months, and answered that he had not. Thereupon the defendant offered in evidence a record of the conviction of a person of the same name for assault and battery in June, 1875. The evidence was rejected by the court.

*Held,* that under section 392 of the Code of Criminal Procedure, and section 832 of the Code of Civil Procedure, the record of the conviction was admissible in evidence and that the court erred in rejecting it.

The people gave evidence tending to show that the defendant was seen soon after the homicide in the vicinity of the house in which it was committed. The defendant had given evidence to show that he was in a saloon at Rochester at about the time the people's witnesses claimed to have seen him. A witness called by the defendant having testified that he had walked from one place to

the other to see how long it would take to do so was asked at what time he left one place and at what time he arrived at the other. An objection to the question having been sustained, he was then asked "at what gait did you walk," which question was also objected to and excluded.

*Held,* that it was error to reject the evidence.

APPEAL from a judgment, entered upon a conviction of the appellant of murder in the first degree, at the Monroe Oyer and Terminer, and from an order of the court denying a motion for a new trial.

*Chamberlin & French,* for the appellant.

*Joseph W. Taylor,* district attorney, for the respondent.

HAIGHT, J.:

The indictment charges that John Kelly, on the 21st day of October, in the year 1883, at the town of Chili, in the county of Monroe, willfully and feloniously, and from a deliberate and premeditated design to effect the death of Jacob Lutz, did make an assault upon and kill him. The indictment further charges, in another count, that at the same time and place said John Kelly, feloniously and by means of force and violence upon the person of Jacob Lutz, did kill him, whilst he, the said John Kelly, was engaged in the commission of a felony, etc. The deceased and his son, Jacob Lutz, Jr., a boy seventeen years of age, lived together in the town of Chili, about four miles south of the court-house, in the city of Rochester, in a frame dwelling-house, near the Genesee Valley Canal railroad. The deceased and his son were both employed by E. B. Chapin, in the phosphate factory, located near by, up to the time of the alleged murder. At the close of the day's work on the twentieth of October, the deceased was paid ten dollars for his and his son's wages for the week ending that day. The money paid consisted of four two-dollar bills and two one-dollar bills. The defendant worked for the same man and and at the same factory in company with the deceased and his son. He was paid the sum of two dollars, being the balance due him for his week's wages. The testimony of Jacob Lutz, Jr., given on the part of the prosecution, is, in substance, that he and his father went home that night and went to bed about eight o'clock; that at about one o'clock in the morning the defendant Kelly rapped upon their door and his father let him in; that Kelly said that he had knocked

a man down up in the city, and a policeman had chased him, and he wanted to stay all night with them, and that they all got into bed together. He then testified that he was awakened about three o'clock in the morning by hearing his father scream; that he raised up in bed himself and received a blow upon his head; that the defendant Kelly was standing by the bedside striking the witness and his father alternately on their heads with some implement; that he finally got out of bed and dressed, the defendant assisting him; that the defendant told him that two men had been in the house and assaulted them; that he then started to go to a neighbor's; that the defendant followed him out to the railroad track, and there the defendant knocked him down by a telegraph pole; that he left him laying there for a time and then took him by the feet and dragged him into the woodshed; that he was kicked and choked, and then the defendant left him and went into the house again; that he heard his father scream again; that the defendant came back to him, kicked him, felt of his feet and then went away; that after the defendant left and went away, he crawled into the house and sat in a chair, until he was found by the witness Baker. Evidence was also given on behalf of the prosecution by John Baker and numerous other witnesses, who visited the house the next morning, which tended to show that the old man Lutz was found dead in bed, having nine wounds upon the head apparently made by some blunt instrument, some of which had fractured the skull so that the brain was oozing forth. The bed was saturated with blood which had apparently flowed from the wounds. One of the boots standing by the bedside had blood upon the heel, with hair that resembled the hair upon the head of the deceased. The leg of the boot was crumpled up as if it had been clutched in the hand. The boy sat in a chair by the stove, having three wounds upon his head from which the blood had flowed down his face and neck, saturating his clothes. He was apparently in a dazed condition and when he rose to walk was unable to do so. On an examination of the clothes of the deceased, only ten cents was found. An examination of the ground near the telegragh pole showed a pool of blood with some spatters upon the pole and fence. The ground also bore marks of some substance having been dragged over it from the telegragh pole to the woodshed. At the woodshed another

pool of blood was found upon the floor. A coat was found at the house, which the boy identified as the one that he had on at the time, which was covered with blood and dirt. In the pig-pen a hat was found which the boy identified as the one which he wore at the time, the inside of which was saturated with blood. Subsequently, a piece of iron pipe was found in the glue racks, near by, with blood stains and hair upon it. The defendant was arrested that morning at half-past ten o'clock. There was found in his possession eight dollars and eighty-two cents, two two-dollar bills, two one-dollar bills, two silver dollars and the balance in change. He had his hair cut that morning and paid a barber a two-dollar bill, receiving back a silver dollar and seventy-five cents in change. He had also paid a shoemaker for mending his boots a two-dollar bill, receiving in change a silver dollar and a ten cent piece. There were blood spots on his coat, near the shoulder, and on one of the buttons, also on the knees of his pants and the bottom of the legs on the under side of the lap. The officer who arrested him testified that in answer to the question as to what he arrested him for, that he told him that there was a murder committed in the town of Chili ; that Kelly asked him how he knew ; that he answered that the son told him ; that thereupon Kelly answered and said : " I was not up to old Lutz's house at all last night." The officer testified that he had not mentioned the name of Lutz at all at that time. Other circumstances were given in evidence on the part of the people, with the evidence of the officers, as to the conversations had with him on the morning of his arrest

The defendant testified that he remained in the city of Rochester during the entire night ; was not at Lutz's at all, and did not commit the crime. The testimony of several witnesses was taken, showing that he was in saloons on St. Paul street the night before until about half-past eleven o'clock. Other evidence was given tending to show that he was in another saloon kept by one Mahar, on St. Paul street, about five o'clock the next morning. He testifies that he slept in a lumber yard during the intervening time. Other evidence was given tending to show that the deceased and his son had frequent quarrels ; that the deceased was in the habit of drinking to excess, and when intoxicated was quarrelsome. We have carefully read and considered all the evidence appearing in the appeal

book. The evidence is of that character which makes it purely a question of fact for the jury to determine. There is evidence to sustain the verdict, and this court cannot, as matter of law, say that the verdict is against the weight of evidence. If the judgment is to be reversed, it must, therefore, be upon errors appearing upon the trial.

The court, in its charge to the jury, defined the crime of murder in the first degree as the killing of one human being by another, when committed from deliberate and premeditated design to effect the death of the person killed, or when the killing is committed without any design to effect the death of the person killed, by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed, or otherwise. The court made no mention of the crime of murder in the second degree or manslaughter, but it stated that it thought that it would confuse, if the court should explain all the different grades of murder or homicide which fall under the general term of homicide, and that it should exclude all other definitions of that crime which do not come within the facts embraced in the evidence. It then proceeded to charge as follows: " There is not any opportunity, gentlemen, for you or me to compromise this case in any respect. It is a conviction of murder in the first degree or an absolute acquittal." At the conclusion of the charge, the defendant's counsel took exception to this charge, and subsequently the court charged as follows: " What I intended to say to you was that a verdict in this case other than that of guilty or not guilty, would not, in my judgment, be borne out by the facts of the case. I say, however, to you, that as a matter of right and power, you can bring in a verdict of a lesser offense under an indictment charging murder in the first degree, and to that extent I modify my charge." The court also charged the jury as follows: " If you shall say that you believe what Jacob Lutz says, I say to you that that alone is sufficient to enable you to find a verdict of guilty in this case." This charge was also excepted to, by the prisoner's counsel.

We are of the opinion that both of these charges were erroneous. The evidence of young Lutz is to the effect that the defendant was admitted into the house by the deceased; that he went to bed with the father and son with their consent; that the ten dollars that was

missing the next morning the deceased had in the pocket of his vest which hung up in the bedroom. The larceny of the money would, therefore, not amount to a felony. We consequently fail to see upon what theory a conviction could be had upon the ground that the killing took place whilst he was engaged in the commission of a felony. If the killing was actually done by the defendant, and the killing was for the purpose of putting the deceased out of the way so that he could subsequently commit the larceny, then the case would fall within the definition of a deliberate and premeditated design to effect death, and the larceny would be the motive for the crime. If, therefore, the conviction is to be sustained it should be upon the ground that the killing was intentional and with a deliberate and premeditated design to effect death. The court in its charge said: "There is not any opportunity for the jury to compromise this case in any respect. It is a conviction of murder in the first degree or an absolute acquittal." This, in effect, takes from the jury that which belongs exclusively to it, the right and power to determine the intent, the deliberation and premeditation. And this is equally true in reference to the charge that in case they believed the testimony of young Lutz, that that alone was sufficient to enable them to find a verdict of guilty. In the case of *Stokes* v. *The People* (53 N. Y., 164) it was held that the charge of the court, in substance, that the legal implication from the fact of the killing was that the act was murder was error; that under the statutes classifying homicide mere proof that one has been deprived of life by the act of another fails utterly to show the class to which the homicide belongs. In the case of *McKenna* v. *The People* (81 N. Y., 360), the plaintiff in error was upon trial of an indictment for murder where the evidence was conflicting. The court charged the jury that if they believed the evidence offered on behalf of the people to be true, they would be justified in finding the prisoner guilty of murder in the second degree. This was held error on the ground that the existence of the intent to kill, which is the necessary ingredient of that crime, was a question to be determined by the jury from all the facts and circumstances; that from the charge as given, nothing being said concerning their duty in this respect, it might well have been understood by the jury as involving an opinion of the court upon this, as well as the other elements of the

crime, that it was likely to mislead and prejudice, as it virtually excluded from the jury the question as to how far the testimony on the part of the prosecution was modified or neutralized by that produced by the defendant, or what inferences should be drawn from any of it. It appears to us that this case is in point and must be controlling upon the question here presented. Murder in the second degree is the intentional killing of a human being without deliberation and premeditation. In the first degree it is the intentional killing with deliberation and premeditation. The intention, deliberation and premeditation are operations of the mind and necessary elements of the crime, and their existence must be determined from the facts and circumstances of the case, and can only be determined by the jury. (*People* v. *Conroy*, 20 Weekly Dig., 242; S. C., 33 Hun, 119.)

Again, we are of the opinion that the charge was not cured by the modified charge. It is true that the court said that the jury, as a matter of right and power, could bring in a verdict of a lesser offense, but in the same connection it was stated that "a verdict in this case other than that of guilty or of not guilty would not, in my judgment, be borne out by the facts of the case." If a verdict of conviction of a jury is not borne out by the facts of the case, it becomes the duty of the court to set it aside as against the evidence. It appears to us that the effect of that charge was that whilst the jury had the right and power to bring in a verdict of a lesser offense, still if they should such a verdict could not be sustained for the reason that it was not borne out by the facts. The court in the modified charge does not withdraw or substantially change the former charge made upon the subject. When upon a criminal trial the judge in charging the jury lays down erroneous propositions, but, upon his attention being called thereto by objections, corrects the misdirections and lays down the correct rule, no error is presented for review. But to obviate an erroneous instruction upon a material point the withdrawal must be absolute and in such explicit terms as to preclude the inference that the jury might have been influenced thereby. (*Greenfield* v. *The People*, 85 N. Y., 75–90; *Eggler* v. *The People*, 56 id., 642; *Chapman* v. *Erie Railway Co.*, 55 id., 579.) The case of *Sindram* v. *The People* (88 N. Y., 196–202) is clearly distinguishable. The judge charged that "there

is no doubt about the assassination," but immediately added thereto "that the deceased person was killed;" in other words, the court only meant and was understood to charge that there was no question raised in reference to the killing; that being a conceded fact upon the trial there was no error. Upon an exception being taken to the charge of the court that the testimony seems to be overwhelming in favor of his having uttered the expression that "he would return on Wednesday and make a bloody row," the judge changed the expression and stated that he was only expressing an opinion and that he left all the questions of fact to the jury; that there was to be no thirteenth juror in the box, etc. It was held that the court had sufficiently withdrawn the erroneous charge. In the case of *Buel* v. *The People* (78 N. Y., 492) the plaintiff in error was on trial charged with murder whilst engaged in the commission of the crime of rape. The court instructed the jury as to the provisions of the statute where the killing takes place whilst a person is engaged in the commission of a felony, and omitted to instruct the jury as to the provisions of the other statutes constituting murder in the second degree, or manslaughter. The defendant made no request of the court to instruct the jury upon those statutes. The court held that it was not error; that the defendant, in case he thought the evidence brought the crime within the definitions of murder in the second degree, or manslaughter, should have asked the court for the proper instructions. But this case is clearly distinguishable. In the crime charged, for killing whilst engaged in the commission of a felony, deliberation, premeditation or intent to kill, is not a necessary ingredient of the crime. And again, the charge was not to the effect that they must convict of murder in the first degree or else acquit. It simply instructed the jury as to what constituted the crime of murder in the second degree, and then left it to the jury.

The court also charged the jury that "an *alibi* is a species of defense which the law looks upon generally with great suspicion." The chief defense interposed by the defendant was an *alibi*. It is but natural that a person who has committed a crime should seek to get away from the scenes of his crime and to avoid detection. It is undoubtedly true that the defense is often resorted to, and at times attempted to be sustained by false and perjured testimony. The testimony given to establish the defense may or may not be

suspicious, depending largely upon the circumstances and the character of the witnesses giving it. It is proper for the jury to scan with care the testimony given, for the purpose of determining whether it is true or false, but we do not understand that the law regards the defense as a suspicious one. On the contrary, the defense is as honorable, and when clearly proved as satisfactory, as any defense which the law permits. If a person is charged with the commission of a crime in the city of Rochester, and the person charged can satisfactorily show that at the time the crime was committed he was absent in the city of New York, surely such a defense is a meritorious one, and if acquitted he should not be subjected to the charge that he was acquitted upon a suspicious defense.

Upon the trial, one Gottlied Nodecker was sworn on behalf of the people, and gave material testimony. On the cross-examination by the prisoner's counsel, he was asked if he had been convicted of an assault and battery in 1875, and sent to the penitentiary for two months; he answered that he had not. Thereupon the prisoner's counsel offered in evidence a record of conviction of Gottlied Nodecker, for an assault and battery, dated June 1, 1875. The district attorney objected. The objection was sustained and exception taken. Section 832 of the Code of Civil Procedure, provides: "A person who has been convicted of a crime or misdemeanor is, notwithstanding, a competent witness in a civil or criminal action or special proceeding, but the conviction may be proved for the purpose of affecting the weight of his testimony, either by the record or by his own cross-examination, upon which he must answer any question relevant to that inquiry, and the party cross-examining him is not concluded by his answer to such a question." Section 392 of the Code of Criminal Procedure, provides, that "the rules of evidence in civil cases are applicable also to criminal cases, except as otherwise provided in this Code." It appears to us that this evidence was competent under these provisions of the Code.

Alfred J. De Lacy was sworn on behalf of the defense, testified that he lived in the city of Rochester and knew where Chapin's bone-works were situated; that he was there last Tuesday; that he went there to walk the distance and see what time it would take. The question was then asked: "You may state what time you left here and what time you reached there?" This was objected to by

the district attorney. Objection sustained and exception taken. Defendant's counsel then offered to show the time that it takes a man to walk the distance, and asked the further question : "At what gait did you walk?" This was objected to. Objection sustained and exception taken. The prosecution had given evidence on the part of an engineer and fireman that were running an engine out on the morning of the homicide, who testified that they saw a man on the railroad track, going toward the city, at about half-past five o'clock in the morning, and this was in the vicinity of the switch, near the house of the deceased. They described his gait as a shuffling, shambling gait, with quick step. They also described his coat and hat. Other evidence was given on the part of the prosecution tending to show that the defendant's walk was peculiar ; that he had a shuffling, shambling gait, quick step, etc., and that the prisoner's coat and hat were similar to those described by the engineer and fireman. This evidence was introduced on the part of the prosecution for the purpose of showing that the defendant was in the vicinity of the crime at that hour in the morning, and that his story that he had remained in a lumber yard in the city over night was not true. The defense had given evidence tending to show that he was in Mahar's saloon, on St. Paul street, the barber shop and shoe shop, at an early hour in the morning, and for the purpose of showing that he could not have been the individual seen by the engineer and fireman approaching the city on the railroad track, the defendant sought to show that he could not have walked from the place described by them to the city so as to have been at Mahar's and the barber shop at the time described by the witnesses who testified to seeing him there. If De Lacy had walked the distance and timed himself whilst walking it, it appears to us that the testimony would have been competent and material. There are numerous other exceptions taken to the admission and rejection of evidence, but none which we think it necessary to consider.

For the reasons stated, we are of the opinion that the judgment must be reversed and a new trial ordered, and for that purpose the proceedings should be remitted to the Court of Oyer and Terminer of Monroe county.

BRADLEY and CHILDS, JJ., concurred.

So ordered.