# Richmond.

## HONESTY *v.* THE COMMONWEALTH.

### JANUARY 7th, 1886.

1. CRIMINAL PROCEEDINGS—*Jurors—Mode of selection—Venire facias.*
   In a case where death may be the punishment, the writ shall require
   to be summoned twenty-four persons of the county or corporation,
   to be taken from a list to be furnished by the judge, residing remote
   from the place where offence is charged to have been committed,
   and qualified in other respects to serve as jurors. From these shall
   be selected a panel of sixteen free from exception, and from this
   panel the accused may strike four ; and the remaining twelve shall
   constitute a jury. *Hall's Case,* 80 Va. 555.
2. IDEM—*Instructions—Case at bar.*—The accused is entitled to a full
   and correct statement by the court of the law applicable to the evi-
   dence in his case, and any misdirection by it in point of law, in
   matters material to the issue, is ground for a new trial. *Rea* v.
   *Trotter,* 26 Gratt. 585.
3. IDEM—*Idem—" Probably."*—An instruction otherwise right will not
   be vitiated by a conclusion in the words following : "And if there
   be a reasonable doubt whether the prisoner had willed, deliberated
   and premeditated to kill the deceased, or to do him some serious
   bodily injury which would *probably* occasion his death, the jury
   ought not to find him guilty of murder in the first degree." Ste. Cr.
   Dig. 161–2.
4. IDEM—*Idem—Evidence*—If an instruction rightly propounds the law,
   and there is any evidence, however slight, to which it is applicable,
   it should be given. *Hopkins* v. *Richardson,* 9 Gratt. 486.
5. IDEM—*Necessity.*—The necessity relied on to justify killing must not
   arise out of prisoners own misconduct. *Lewis' Case,* 78 Va. 733.
6. IDEM—*Provocation.*—Provocation sought, or voluntarily provoked,
   cannot excuse killing or doing bodily harm. No provocation what-
   ever can render homicide justifiable, or even excusable. The lowest
   grade to which it can reduce homicide is manslaughter.

7. IDEM—*Implied malice—Murder.*—If a man kill another suddenly, without any, or without a considerable provocation, the law implies malice, and the homicide is murder.

8. IDEM—*Intoxication and insanity as evidences—Burden of proof.*—The *onus* rests on accused to prove, if he relies on intoxication as a defence, that when he committed the offence his condition, from intoxication, was such as to render him incapable of doing a wilful, deliberate and premeditated act. And so of insanity. Both must be proved as independent facts. *Baccigalupo's Case,* 33 Gratt. 817–18.

9. IDEM—*Murder in first degree—Case at bar.*—The facts disclosed by the record here show a homicide committed deliberately with a deadly weapon—where the law implies the malice requisite for murder in the first degree—a man being presumed to intend the natural and probable consequences of his own act.

Error to judgment of corporation court of Winchester, on the verdict of a jury finding Wesley Honesty guilty of the murder, in the first degree, of Joseph McFaul, upon the indictment pending in that court, and sentencing the said Wesley Honesty to death by hanging. To this judgment the prisoner obtained, from one of the judges of this court, a writ of error and *supersedeas;* which was argued at Staunton, but decided at Richmond.

Opinion states the case.

*Richard Parker, C. M. Louthan* and *L. T. Moore,* for the prisoner.

*F. S. Blair,* attorney-general, and *W. R. Meredith,* for the Commonwealth.

RICHARDSON, J., delivered the opinion of the court.

The prisoner, by his counsel, demurred to the indictment, and the court overruled the demurrer, and rightly did so.

At the trial the prisoner took several bills of exceptions to the rulings of the court, and these present the points for de-

cision, including the facts proved, which are set forth in one of them.

The first assignment of error is that "the jury was not legally selected." The facts relating to this assignment are set forth in the prisoner's bill of exceptions, No. 1, from which it appears that twenty-four persons—qualified jurors—had been summoned, as required by law, and were in attendance; and the court, proceeding to select a panel of sixteen therefrom, on examination two of the number were found by the court disqualified by having previously formed and expressed opinions as to the guilt or innocence of the prisoner and were set aside; that then two others of the said twenty-four persons were examined by the court and found to be duly qualified and free from exception; and that the court, without examining any others of the said twenty-four, directed the panel of said sixteen to be handed to the prisoner that he might strike four therefrom, and that the remaining twelve should constitute the jury for the trial of the cause; and that to this mode of selecting the jury the prisoner objected, and moved the court not to proceed to select a panel of sixteen as aforesaid until twenty-four persons, duly qualified to act as jurors, and free from exception, and not disqualified by reason of opinions previously formed and expressed as to the guilt or innocence of the prisoner, should be obtained and be present, claiming that from said twenty-four a panel of sixteen persons free from exception should be *selected by lot,* and that from the panel of sixteen so selected the prisoner might strike four, and that the remaining twelve should constitute the jury. The court overruled the motion, and the prisoner excepted.

This objection to the mode of selecting the jury is without merit, as may be speedily shown. The mode of selection insisted on by the learned counsel for the plaintiff in error, is precisely that which this court held to be erroneous in *Hall's*

*Case*, 80 Va. 555. Delivering the unanimous opinion of the court, Lewis, P., in that case, said: "Of the twenty-four persons originally summoned, sixteen having been found free from exception, the jury for the trial of the accused ought to have been selected from the panel of sixteen, who were thus found to be qualified. And the selection should have been made by the accused striking four from the panel, leaving the remaining twelve to constitute the jury." Hence, the mode of the selection held by this court in that case to be the proper one, is the very mode that was pursued by the corporation court of Winchester, in this case; and is the precise mode of selection of a jury for the trial of a felony punishable with death that is prescribed by the fourth and eighth sections of chapter 17, Acts of 1877–78, the law in force, the provisions of which are plain and imperative, and not merely directory.

That the full number of twenty-four persons authorized to be summoned, are not required to be present before the court can proceed to select the panel of sixteen, free from exception, is put beyond all question by the provision in the fourth section, that "in *any* case of felony, when a sufficient number of jurors for the trial of the case cannot be had from those *summoned and in attendance*, the court may direct another *venire facias*, and cause to be summoned from the bystanders, or from a list to be furnished by the court, so many persons as may be deemed necessary to complete the jury. Thus, in the event named, another *venire facias* is made necessary. When, by this mode of proceeding, a panel of sixteen has been selected, free from exception, the court must stop and permit the prisoner to exercise his peremptory right to strike off four of the sixteen, leaving the remaining twelve who, it is declared, shall constitute the jury. If the twenty-four, all free from exception, must be present, then there is no legal way of getting rid of the eight in excess of the requisite panel of six-

teen. · But, for the plaintiff in error, it is insisted that this difficulty is obviated by selecting the panel of sixteen from the twenty-four *by lot.* It is a sufficient answer to this to say that the statute does not so provide. There is no authority for resorting to a ballot, except in case the prisoner, when the panel of sixteen has been selected, fails to strike off four, and then, and only then, the twelve who shall constitute the jury shall be selected from the panel of sixteen by lot. The simple requirement of the statute is, that "there shall be selected from the persons summoned a panel of sixteen, free from exception," &c. The accused himself cannot make the selection. He can only strike four from the sixteen selected by the court upon examination. Who, then, but the court conducting the trial, can properly do so?

A somewhat similar question arose in *Sands' Case,* 21 Gratt. 821, under section 9 of chapter 262, Acts of 1870–71, a statute in principle not, in this respect, unlike the present statute. The question was readily disposed of by Moncure, P., who said: "If as many as sixteen persons were not summoned on the first *venire facias,* where is the difficulty of having other qualified persons summoned, until a panel of sixteen jurors, free from exception, shall be completed? To be sure the ninth section does not literally embrace such a case, but it does in spirit and effect. What the accused is entitled to have is a panel of sixteen jurors, from which a jury for the trial of his case may be selected. Suppose twenty-four persons are summoned, and all attend and are free from exception, how are sixteen of them to be chosen to constitute the panel? The accused cannot make the choice. The officer can call any sixteen of them he pleases, and put them on the panel. The accused may challenge four, and the remaining twelve will constitute the jury. Suppose only sixteen of the twenty-four are summoned, the others not being found, and the sixteen are

free from exception, why may not they constitute the panel? Why, when more than sixteen have been summoned, and the others are returned 'not found,' may not *the court* proceed to ascertain whether, of those summoned and in attendance, there be as many as sixteen free from exception, and if so, to constitute a jury out of that number ?"

It is plain then that the requirement of the statute is that twenty-four or more persons having been summoned, there should be selected by the court from that number, or from those who appear, sixteen persons, free from exception, from whom the accused may strike four, or upon his declining so to do, twelve of the panel of sixteen shall be selected by lot, who shall constitute the jury. Whatever may be the advantage, or the disadvantage of this precise mode of selection over any other to the accused, it is so written, and it is mandatory. Indeed, it is not perceived in what respect a strict compliance with the provisions of the statute now in force are less favorable to the accused than the law as it formerly was. The leading requirements are few and simple, and they afford the accused in every case of felony, whether punishable with death, or not so punishable, ample protection and the widest range of selection consistent with the demands of justice and the public good.

After the evidence was heard—tending to prove the facts as certified by the court, which will hereinafter be set forth—on the motion of the prisoner by his attorney, the court gave to the jury ten instructions as follows—to-wit:

I. The court instructs the jury that on the trial of a case of felony (as the present is) they are judges of the whole case, both on the law and on the evidence.

II. A person charged with crime is always presumed to be innocent until his guilt is fully proved by the evidence. Any mere preponderance of evidence is insufficient to convict him

of such crime, unless upon the evidence he is proved to be guilty beyond any reasonable doubt.

III. That if the jury shall have any reasonable doubt as to any important fact necessary to convict the prisoner of the offence of murder, whether in the first or second degree, they are to give the prisoner the benefit of such doubt.

IV. The court instructs the jury that every homicide is presumed in law to be murder in the second degree, and punishable by confinement in the penitentiary; and in order to elevate the offence to murder in the first degree, the burden of proof is on the Commonwealth; and to reduce the offence to manslaughter the burden of proof is on the prisoner.

V. The court instructs the jury that to constitute murder in the first degree the evidence must clearly and distinctly prove, beyond any reasonable doubt, that the prisoner was not only incited to the killing of the deceased by malice, and desperate wickedness of heart; but such killing must have been a wilful, deliberate, and premeditated act on the part of the prisoner; in other words, at the time of the killing the prisoner must have distinctly understood what he willed and intended to do; he must have also reflected, and deliberated, and premeditated that he would kill the deceased, or do him some serious bodily injury, the probable result of which would be death. · And if there be a reasonable doubt whether he had willed, and deliberated, and premeditated to kill the deceased, or do him some serious bodily injury, which would probably occasion his death, they ought not to find him guilty of murder in the first degree.

VI. To constitute a killing, murder in the second degree, it must appear from the evidence, beyond a reasonable doubt, that the killing was done from malice—that is, from a wicked and depraved heart.

VII. If the jury shall find from the evidence that the kill-

ing was done without malice—in the heat of passion, in a sudden brawl, on a sufficient provocation—such killing amounts to voluntary manslaughter only; if, however, they find that the killing was done in the heat of passion, but on a slight and insufficient provocation, such killing may amount to murder in the second degree.

VIII. The court instructs the jury that in all cases where the question is between murder in the first degree and murder in the second degree, the fact of *drunkenness* may be proved, and should be considered by the jury, as tending to show the mental state of the accused, and whether the killing sprung from a premeditated purpose to kill, or from passion excited by inadequate provocation.

IX. Though the jury shall believe from the evidence that the prisoner, on the night of the 14th of November, 1884, had been indulging in threats against white Democrats, whilst a Democratic celebration was being had in the town of Winchester, and its procession was moving through said town, and that the deceased was a Democrat; yet, if they further find from the evidence, that after said celebration was over, on that night, a sudden affray occurred between the prisoner and the deceased, and that the deceased first struck the prisoner with a walking-stick, and immediately thereafter the prisoner threw a stone or brick at the deceased, which struck him on the head, from which the deceased died within a few hours afterwards; then the presumption of law is, that the killing was occasioned by his having been struck with the stick by the deceased; and to elevate the prisoner's offence to murder, the Commonwealth must show by the evidence that the killing was done with malice, and not by reason of his having been struck by the deceased.

X. The court instructs the jury, that although they shall believe from the evidence that at the time of the killing there

was an existing grudge on the part of the accused to the deceased, but that the blow struck by the prisoner—which caused the death of the deceased—was given on a sudden affray, and because of fresh provocation, then the presumption is that the killing was because of the fresh provocation; and, to elevate the offence to murder, it devolves on the Commonwealth to show that the killing was because of the old grudge.

These instructions having been given for the prisoner, thereupon, on the motion of the attorney for the Commonwealth, the court gave the jury the following instructions—to-wit:

1st. Murder is the unlawful killing of any person with malice aforethought.

2d. Murder is distinguished by the law of Virginia as murder in the first degree, and as murder in the second degree.

3d. Every homicide in Virginia is presumed in law to be murder in the second degree; in order to elevate the offence to murder in the first degree, the burden of proof is upon the Commonwealth; and to reduce the offence to manslaughter, the burden of proof is upon the prisoner.

4th. To constitute murder in the first degree the prisoner must have been incited to the killing by malice, and the killing must have been a wilful, deliberate and premeditated act on the part of the prisoner; that is to say, he must have willed, deliberated and premeditated that he should kill the deceased or do him some serious bodily injury, the necessary result of which would be his death, and from which he died.

5th. On a charge of murder malice is presumed from the fact of killing. When the killing is proved, and is unaccompanied with circumstances of palliation, the burden of disproving malice is thrown upon the accused.

6th. Whenever the killing is wilful, deliberate and premeditated, the law infers malice from this fact.

7th. The rule of law is that a man shall be taken to intend

that which he does, or which is the necessary consequence of his act.

8th. A mortal wound given with a deadly weapon, in the the previous possession of the slayer, without any, or upon very slight, provocation, is, *prima facie*, wilful, deliberate, and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances.

9th. The jury are instructed that to sustain provocation as a defence to murder in the first degree, it must be shown that prisoner, at the time of the fatal blow, was deprived of the power of self-control, by the provocation which he had received; and in deciding the question whether this was or was not the case, regard must be had to the character of the provocation, to the nature of the act by which death was caused, to the time which elapsed between the provocation and the act which caused death, to the offender's conduct during the interval, and to all the circumstances tending to show the state of his mind at the time he committed the act.

10th. Although the jury may believe from the evidence that the prisoner struck the deceased the blow which caused his death, during a quarrel, yet, if they further believe from the evidence, beyond a reasonable doubt, that the quarrel was provoked and brought on by the prisoner, with the object to provoke the deceased to strike him, in order to have a pretext to take his life, and that the prisoner did thus strike the deceased the fatal blow, from which he died, as charged in the indictment, then they are instructed that such an act constitutes a wilful, deliberate, and premeditated killing, and as such is murder in the first degree.

11th. If the jury believe from the evidence, beyond a reasonable doubt, that the prisoner gave the deceased the blow from which he died, as charged in the indictment, and that he was, though intoxicated at the time of giving the deceased the

said blow, capable of knowing the nature and probable consequences of his act, and so knowing the nature and probable consequences of his act, gave the deceased the blow from which he died, as charged in the indictment, with the wilful, deliberate, and premeditated purpose of killing him, without adequate provocation, and from reckless wickedness of heart, then they are instructed that they should find the prisoner guilty of murder in the first degree.

12th. If the jury shall believe from the evidence that the prisoner gave the deceased, Joseph McFaul, the blow from which he died, as charged in the indictment, without adequate provocation, and through reckless wickedness of heart, but at the time of so doing, his condition from intoxication was such as to render him incapable of doing a wilful, deliberate, and premeditated act, and that the act was not committed in pursuance of a purpose, wilfully, deliberately, and premeditatedly formed before he became intoxicated, to commit murder, then they cannot find him guilty of murder in the first degree.

13th. But if they shall believe from the evidence, beyond a reasonable doubt, that the prisoner gave the deceased the blow from which he died, as charged in the indictment, and that though he was, at the time of committing the act, so intoxicated as rendered him incapable of a wilful, deliberate and premeditated purpose; yet if they believe from the evidence, beyond a reasonable doubt, that the prisoner, before becoming intoxicated, or while he was, though drinking, still in a condition in which he was capable of forming a wilful, deliberate and premeditated purpose, had formed a. wilful, deliberate and premeditated purpose to commit murder, and that he afterwards, in pursuance of that purpose so formed, gave the deceased the blow from which he died, as charged in the indictment, with malice prepense, without sufficient provocation, and from reckless wickedness of heart, then they are instructed that such an

act upon the part of the prisoner, though he may have been intoxicated at the time of committing it, constitutes in the eye of the law a wilful, deliberate and premeditated killing, and as such is murder in the first degree.

To the granting of these instructions, asked for by the Commonwealth, and each and every of them, the prisoner, by his counsel, objected, and moved the court to refuse them; but the court overruled the motion, and gave the instructions as asked for by the Commonwealth; to which ruling of the court the prisoner excepted; and this is the prisoner's bill of exceptions, No. 2.

It is well settled that the accused has a right to a full and correct statement by the court of the law applicable to the evidence in his case, and that any misdirection by the court, in point of law, on matters material to the issue, is ground for a new trial. Wharton's Crim. Pl. and Pr., sections 709 and 710; *Rea* v. *Trotter*, 26 Gratt. 585.

The instructions asked for on behalf of the prisoner appear to have been given as asked. In connection with them only one question suggests itself, and that is as to the correctness of the seventh instruction. That instruction, given on the prisoner's motion, concludes with this sentence: "And if there be a reasonable doubt whether he" (the prisoner) "had willed, deliberated, and premeditated to kill the deceased, or to do him some serious bodly injury, which would *probably* occasion his death, they" (the jury) "ought not to find him guilty of murder in the first degree."

At first glance it seemed doubtful whether this direction stated the law fairly for the prisoner, and whether the word "*probably*" should not have been "*necessarily*," and whether, though it was given on his own motion, as he is entitled to a correct statement of the law, and as the court, in a criminal case, is responsible for the correctness of its direction to the

jury, the instruction was not erroneous.   But upon further examination the instruction seems to state the law with substantial correctness.   It is obvious that if one wilfully, deliberately, and premeditatedly does another a serious bodily injury, which he knows may *probably* cause the death of the party injured, the act is murder in the first degree.   For illustration : "If A finds B asleep on straw, and lights the straw, meaning to do B serious bodily injury, but not to kill him, and B is burned to death, it is murder."   Stephen's Crim. Dig. pp. 161–2; *Errington's Case*, 2 Lewin, 217.   See also *Dock's Case*, 21 Gratt. 909, where it was held that if the prisoner in the execution of a malicious purpose to do the deceased a serious personal injury or hurt, by wounding or beating him, killed him, the offence is murder.   Taken all together, we are of opinion that the instructions given on the prisoner's motion are full, fair, and correct.

Now, as to the instructions given on behalf of the Commonwealth to the first seven, no specific error is assigned in the petition, or by counsel in argument, and they appear to be free from any substantial error.

The eighth instruction is the first complained of.   The learned counsel for the plaintiff in error insist that the language is too broad; that instead of saying, "a mortal blow given with a deadly weapon in the previous possession of the slayer," &c., it should have said, "a mortal blow given with a deadly weapon, with which the slayer had armed himself in order to make an attack on the deceased, or to provoke an attack upon himself, &c., and contend that the previous possession of the weapon, which proved fatal, would not prove deliberation and premeditation, as the slayer might have habitually carried a walking-stick," &c.   It is, however, clear that a jury may presume premeditation from the giving of a mortal blow with a deadly weapon in the previous possession

of the slayer, leaving him, as the instruction leaves him, to repel the presumption by proof of extenuating circumstances. The presumption would be stronger that arises from a mortal blow given with a deadly weapon, with which the slayer had armed himself to make the attack ; but that fact does not preclude the presumption that arises, less strongly perhaps, from a mortal blow given with a deadly weapon in the previous possession of the slayer.

At all events, the propriety of such an instruction, when applicable to the evidence in the case, is not an open question the instruction having been copied *verbatim* from the language of the general court in *Hill's Case,* 2 Gratt. 606, whilst the principles involved in it have been approved and applied by this court in several cases.    See *Vaiden's Case,* 12 Gratt. 717; *Howell's Case,* 26 Gratt.  995; *Wright's Case,* 75 Va.  914; *Lewis' Case,* 78 Va. 732.

Next, objection is made to the ninth instruction for the Commonwealth, because it says to the jury that to render provocation a defence to murder in the first degree, it must be shown that the prisoner, at the time of the fatal blow, was deprived of the power of self-control by the provocation he had received, and that in deciding whether this was the case, all the circumstances must be considered.   It is insisted for the plaintiff in error that the spirit of our criminal law makes allowance for the passions and anger short of such as occasions loss of self-control, and holds the offence to be voluntary manslaughter, or murder in the second degree, according to the extent of the provocation.

After all, this is but another way of expressing the same idea, and an admission of the principle upon which the instruction is founded.   Provocation is the cause.   Loss of self-control is the effect.   Provocation does not extenuate the guilt of homicide, unless the person provoked is, at the time

when he does the act, deprived of the power of self-control. To the extent to which he is so deprived, the guilt is extenuated. Power of self-control is essential to deliberation. Without deliberation, there can be no guilt of murder. The jury must, therefore, consider all the surrounding facts in order to judge whether the accused possessed deliberation or had lost self-control. The instruction is right in principle, and is sustained by the high authority of Stephens' Crim. Dig. 167, from which it was evidently almost literally transcribed. See also Wharton on Homicide, 1; *Boswell's Case*, 20 Gratt. 860; *Poindexter's Case*, 33 Gratt. 766; *McDaniel's Case*, 77 Va. 281.

To the tenth instruction, the objection is, that "there is no evidence, or but very slight evidence, to show that the prisoner had sought to provoke the deceased to strike him, so as to give him an excuse to murder him," and hence no basis for the instruction. The well-established rule of practice is, that if there is any evidence in the cause, though it be slight, to which the instruction is applicable, and it propounds the law correctly, it should be given. *Farish* v. *Reigle*, 11 Gratt. 697; *Early* v. *Garland*, 13 Gratt. 1; *Hopkins* v. *Richardson*, 9 Gratt. 485.

There was unquestionably, evidence in the cause to which the instruction was applicable. The evidence is not certified, but the facts proved are. William Shade proved "that he saw two negroes in the alley following up a young white man, who seemed afraid of them. They were pushing on the white fellow, and following him." G. R. Henry proved "that he saw the prisoner and Banks standing in a threatening position in front of McFaul, the deceased, in the alley; heard them cursing McFaul, and that from their words and manner he believed they were trying to get McFaul into a fight." Walter Irving proved that he heard the prisoner and Banks in the alley, cursing and threatening McFaul; that the prisoner

picked up a stone or brick; that McFaul kept backing from them, and told them to keep back, or he would strike with a stick, which he held in his hand; that his stick was a small walking-stick; that McFaul backed up against the fence; that Banks said to the prisoner, "stick to him and we will attend to him." It was further proved, that after McFaul had got out of the alley and stopped a moment on the pavement, the prisoner rushed up upon McFaul, and with his left hand, seized him by the collar of his coat; that deceased warned him twice to keep back, and struck the prisoner a slight blow on the left arm, which he had thrown up, with a small walking-stick he had in his hand, and that then the prisoner struck the deceased a severe blow on the left temple, with a large piece of brick (more than half a brick), giving the fatal wound from which the deceased died that night after 12 o'clock, and that the blow was necessarily mortal."

These facts abundantly show that the instruction correctly propounded the law. They show, too, that the alleged provocation—the blow struck by the deceased with his walking-cane—was voluntarily provoked by the prisoner. Provocation sought, or voluntarily provoked, cannot excuse killing or doing bodily harm. Steph. Crim. Dig. 164. A man shall not, in any case, justify the killing of another by a pretence of necessity, unless he was without fault in bringing that necessity on himself. 1 Hawk. P. C., ch. 10, § 22, p. 82; 1 Russell on Crimes, 669; 1 Hale. P. C., 405; *Vaiden's Case, supra; Mitchell's Case,* 33 Gratt. 777. And in *Lewis' Case,* 78 Va. 733, this court approved an instruction in the following words: "That on a trial for murder, the necessity relied on to justify the killing must not arise out of the prisoner's own misconduct.   *   *   *   No provocation whatever can render homicide justifiable, or even excusable; the least it can reduce it to is manslaughter. If a man kill another suddenly, without any, or without

a considerable, provocation, the law implies malice, and the homicide is murder; but if the provocation were great, and such as must have greatly provoked him, the killing is manslaughter only. Words of reproach, how grievous soever, are not provocation sufficient to free the party killing from the guilt of murder." See Wharton's Am. Cr. Law, § 970.

Here the prisoner, armed with a dangerous and deadly weapon, without any provocation, rushed upon the deceased, who gave back and twice warned the prisoner not to approach, or he would strike him with the walking-stick he held in his hand. The prisoner refused to take the warning; rushed upon and collared the deceased, who struck him a slight blow on the left arm, thrown up to ward the blow off; and thereupon the prisoner struck the deceased a cruel unmanly blow, which caused his death. The provocation relied on—the blow with the stick—cannot, in the light of the facts certified, even extenuate the guilt of murder. We are therefore of opinion that the said eleventh instruction is faultless.

To the twelfth instruction it is objected, that it was liable to be understood as throwing upon the accused the burden of proving that "the act was not committed in pursuance of a purpose, wilfully, deliberately and premeditatedly formed before he became intoxicated, to commit the murder." It is difficult to conceive how the instruction could be so construed. The case is hypothetically stated as to both propositions contained in the directions to the jury; and they are told that if, from the evidence, they believe the one or the other, they cannot find him guilty of murder in the first degree. The instruction is, in fact, very favorable to the prisoner. *Boswell's Case*, 20 Gratt. 860. But in so far as the instruction may be construed as imposing on the prisoner the burden of proving, that when he committed the homicide, his condition from intoxication was such as to render him incapable of doing a

wilful, deliberate and premeditated act; the *onus* of establishing such condition does rest on him. The law presumes every person sane till the contrary is proved. The Commonwealth having proved the *corpus delicti*, and that the prisoner committed the criminal act, has made out her case. If the prisoner relies on the defence of insanity (whether from intoxication or other cause), he must prove it to the satisfaction of the jury. And the insanity which is relied on as a defence must be proved substantially as an independent fact, and not merely by so much proof as may raise a rational doubt of his sanity at the time of committing the offence with which he is charged. *Bacciga-lupo's Case,* 33 Gratt. 807.

The thirteenth and last instruction is objected to, not on the ground that it does not correctly inform the jury as to the law, for in that respect it cannot be questioned; but because, as it is said, "it has no basis of evidence which could reasonably justify the theory therein set forth." There is unquestionably in the record evidence tending to establish such a theory. To bring this plainly to view, it is here necessary to state substantially the facts proved, as certified by the court below.

On the evening and night of the 14th of November, 1884, quite a large number of persons—members of the Democratic party—were assembled in the city of Winchester; and engaged in celebrating by a torchlight procession and public speaking, their victory in the then very recent presidential election. The prisoner, who was opposed to the party which had so triumphed, during said evening and night, and before the commission of the offence with which he is charged, had, at different times and in different ways, exhibited exceeding bitterness and malevolence towards the persons engaged in celebrating their victory as aforesaid, and frequently was heard to curse them, and to declare his intention "to kill some damned Democratic son of a bitch before morning." He had been

drinking ardent spirits, some witnesses thought, to intoxica-
tion. The deceased lived in the town of Winchester, where
these events occurred, and that evening took part in the pro-
cession. There is no proof of an acquaintance between them
previous to their meeting in the alley, in said town, where the
prisoner and one Banks became engaged in a quarrel with
the deceased, which, in the manner indicated by the facts
already recited in the discussion of the tenth instruction, ter-
minated in the prisoner's inflicting on the deceased the blow
which caused his death.

Whatever might have been the effect of this evidence on
the minds of the jury in respect to the said theory, it cer-
tainly, in some degree, tended to the establishment thereof,
sufficiently at least to justify the said corporation court in
giving the instruction. In support of this thirteenth instruc-
tion, in point of law, see *Boswell's Case* and *Baccigalupo's Case,
supra;* Whar. Cr. Law (fourth edition), sections 42 and 43,
where it is said, that "it was properly held that where the
charge was knowingly passing counterfeit money with intent
to cheat, the drunkenness of the defendant at the time of the
offence, was a fit subject for the consideration of the jury,
there being no ground to suppose that the defendant knew the
money to be counterfeit *before* he was drunk;" and, also, that
"if there is a *previous* determination to resent a slight affront
in a barbarous manner, the state of drunkenness in which the
prisoner was, ought not to be regarded, for it would furnish no
excuse." The subsequent act furnishes the best means of judg-
ing what the nature of the previous expression of intention
really was. And so, Anderson, J., in *Willis' Case,* 32 Gratt.
929, says: "Drunkenness is only entitled to weight when and
so far as it tends to show that the offender did not act in a
frame of mind to act with that determination and premedita-
tion which is necessary to constitute murder in the first degree.

Great caution is required in applying this doctrine, because there are few cases of premeditated violent homicide in which the defendant does not nerve himself to the encounter by liquor." In Desty's Am. Cr. Law, section, 27*b*, it is said: "If the accused determined upon the act when he was sober, and fortified himself with liquor for its perpetration, or did the act deliberately, his intoxication furnishes no extenuation."

Lastly, the prisoner moved the court to set aside the verdict of the jury and grant him a new trial, on the ground that the verdict was contrary to the evidence; but the court overruled the motion, and the prisoner again excepted. And in this bill of exceptions the court set forth and certified the facts proved. The facts are detailed at much length, and very much in the manner of a narrative of the evidence. The substance of the facts proved has already been given in discussing the tenth and thirteenth instructions. A brief summary will now suffice. On the night of the 14th of November, 1884, at the celebration above referred to, were many men, women and children. Many persons from the country came in delegations on horseback, and they all marched in procession through the principal streets. The prisoner took a drink at a bar-room that evening between 6 and 7 o'clock. He and one Tabby Banks were on the street about 7 o'clock, hallooing and dancing. The prisoner had a large stick in his hand. He and Banks were boisterous, rude and offensive to passers-by, and threatening loudly "to kill some damned Democratic son of a bitch before morning." As one witness passed him, he said: "If any son of a bitch of a Democrat as much as rubs against me, I will give him hell." As the procession passed he exhibited much excitement and anger, made threats, and even seized and angrily tried to take a torch from one who was marching in the procession. Similar disorderly, threatening and insulting demonstrations were made by him from time to time during the celebration, and until after the commission of

the crime with which he is charged. The deceased marched in the procession, and, the parade being over, was one of the crowd at the speaking. The speaking over, he and a youth named Pence proceded down Loudoun street towards the home of the former. When they reached the mouth of Crane's Alley, nearly opposite Taylor's Hotel, Pence suggested that they go into the alley to answer a call of nature. When they started into the alley they heard loud talking or quarreling there. As they passed two negroes, the prisoner and Banks, in the alley, the deceased said in a mild, pleasant way, "What's all this noise about in here?" One of the negroes replied: "What the devil have you got to do with it?" The deceased, not stopping, but walking on passed them into the alley, said: "That's all right, but I want this fuss stopped in here." Pence thought the two negroes went out of the alley. The witness, Scrivener, who was sitting in his buggy in the alley, saw the two colored men quarreling with the deceased, and cursing him. He heard deceased say nothing except that "he lived in there," in answer to their question "if he lived in there." And he saw one of the negroes stoop down and rise up as if he had picked up a stone, and held his arm down as if he held a stone. The witness Shade saw the negroes following up and pushing on the deceased, who seemed afraid of them. The witness Irving heard them cursing and threatening the deceased, who told them "to keep back, or he would strike them with a stick"—a small walking-cane which he held in his hand—and saw the deceased back up against the fence, and heard Banks then say to the prisoner: "Stick to him and we will attend to him." The witness Henry saw the prisoner and Banks cursing the deceased in the alley, and seemed from their words and manner to be trying to get him into a fight.

It was furthermore proved that when the deceased had got out of the alley, and stopped a moment on the pavement, the prisoner rushed up upon the deceased, and with his

left hand seized him by the coat collar; that the deceased twice warned the prisoner to keep back, and either struck at, or struck the prisoner a slight blow on the left arm, which he had thrown up, with a small walking-cane, which he held in his hand, and that then the prisoner struck the deceased a severe blow on the left temple with a large piece of brick (more than half a brick), giving the fatal wound, from which the deceased died that night after 12 o'clock. It was also proved that the blow struck the deceased by the prisoner was necessarily mortal; that when struck by the prisoner the deceased reeled out into and staggered across the street, and that while he was staggering across the street the said Banks threw a stone at the deceased, which struck him in the side, but did no injury. Two physicians made a *post-mortem* examination of the body of the deceased about 10 o'clock the next morning, and proved the necessarily mortal effect of the blow struck him by the prisoner, and the result of the blow struck him by Banks.

Moreover, the deceased was a slender youth, while his assailants were stout, robust men. The criminal act appears to have been committed deliberately, and was committed with a deadly weapon likely to produce the result that followed. In such case the law presumes the malice requisite to murder; for the law infers that the natural or probable effect of any act deliberately done, is intended by its actor. See 2 Whar. Cr. Law, section 954. Here the mortal wound was given with a deadly weapon in the slayer's previous possession, and there being no evidence of provocation, the case, is *prima facie* murder in the first degree. Certainly the facts warranted the jury in so finding. We are, therefore, of opinion that there is no error in the record, and that the judgment of the said corporation court of Winchester must be affirmed.

Hinton, J., dissented.

Judgment affirmed.